J-A29035-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| CARL FISHER, | : | |
| | : | |
| Appellant | : | No. 419 WDA 2016 |

Appeal from the Judgment of Sentence November 20, 2015
in the Court of Common Pleas of Somerset County,
Criminal Division, No(s): CP-56-CR-0000800-2012

BEFORE: DUBOW, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED JANUARY 20, 2017**

Carl Fisher ("Fisher") appeals from the judgment of sentence imposed after a jury convicted him of two counts each of criminal solicitation (involuntary deviate sexual intercourse ("IDSI") and indecent assault, respectively) and criminal attempt (IDSI and indecent assault, respectively), and one count of corruption of minors.[1]  We affirm.

The trial court exhaustively set forth in its Opinion the factual and procedural history underlying this appeal, which we adopt as though fully set forth herein.  ***See*** Trial Court Opinion, 5/26/16, at 1-16.

In this timely appeal, Fisher presents the following issues for our review:

> I.  Whether the lower court committed an error when it allowed the case to proceed on the Amended Information filed by the District Attorney[,] without prior leave of court[,] in

---

[1]  ***See*** 18 Pa.C.S.A. §§ 902(a), 3123(a)(7), 3126(a)(8), 901(a), 6301(a)(1)(ii).

> violation of Pennsylvania Rule[s] of Criminal Procedure 560 and 564, despite [Fisher's] objections[?]
>
> II. Whether the lower court committed an error by allowing the case to proceed despite [Fisher's] objections and arguments that he was denied his right[] to a speedy trial[,] in violation of Pennsylvania Rule of Criminal Procedure 600[?]
>
> III. Whether the lower court committed an error by refusing to allow [Fisher] to cross-examine regarding the victim's reluctance to testify[?]
>
> IV. Whether the lower court committed an error in allowing the victim's written statement to be presented to the jury[?]
>
> V. Whether the lower court committed an error by denying [Fisher's] Motion *in limine*, and by denying objections at trial [concerning the introduction] and admission of an e-mail exchange between [Fisher] and a co-worker[?]
>
> VI. Whether the lower court committed an abuse of discretion when it considered the Sexual Offender Assessment Board (["]SOAB["]) report as a factor in imposing sentence, especially when there had been no hearing to determine whether [Fisher] was found to be a sexually violent predator[,] and whe[re] the report contained almost nothing but hearsay[?]
>
> VII. Whether the verdict is against the sufficiency of the evidence[?]
>
> VIII. Whether the verdict is against the weight of the evidence[?]

Brief for Appellant at 4-5 (capitalization omitted, issues renumbered for ease of disposition).

Fisher first argues that the trial court erred when it denied his two pretrial Motions to Quash the Commonwealth's Amended Information. ***See*** ***id.*** at 21-28. According to Fisher, the Amended Information was "technically

J-A29035-16

defective," and the four additional charges raised against Fisher therein should have therefore been dismissed, for two reasons:

> 1) the District Attorney's Office did not specifically obtain court approval prior to the amendment[,] in violation of Pa.R.Crim.P. 564;[2] and, 2) even if the Amended Information were not void on its face, the Information and Amended Information do not contain specific factual allegations[,] nor does the Amended Information cite specific statute sections, thus rendering it in violation of Pa.R.Crim.P. 560.[3]

Brief for Appellant at 21, 23 (footnotes added). Concerning Rule 564, Fisher argues as follows:

> The language of Rule 564 specifically requires, as a prerequisite to amending an information, court approval by the language "the court may allow[.]" [Pa.R.Crim.P. 564.] Thus, the trial court becomes the gatekeeper, and prior to any amendment of an information, the Commonwealth must ask the court for the requisite permission. Failure to do so is fatal to that amended information.

---

[2] Rule 564 provides, in relevant part, as follows: "The court may allow an information to be amended when there is a defect in form, the description of the offense(s), the description of any person or any property, or the date charged, provided the information as amended does not charge an additional or different offense." Pa.R.Crim.P. 564.

[3] Rule 560, which governs the filing and contents of a criminal information, provides that an information should contain, *inter alia*, "a plain and concise statement of the essential elements of the offense substantially the same as or cognate to the offense alleged in the complaint[.]" Pa.R.Crim.P. 560(B)(5); **see also Commonwealth v. Sims**, 919 A.2d 931, 939 (Pa. 2007) (stating that "[t]o comport with due process, the notice provided must be sufficiently specific so as to allow the defendant to prepare any available defenses should he exercise his right to a trial."). Rule 560 further provides that "[t]he information shall contain the official or customary citation of the statute and section thereof, or other provision of law that the defendant is alleged therein to have violated; but the omission of or error in such citation shall not affect the validity or sufficiency of the information." Pa.R.Crim.P. 560(C).

- 3 -

Brief for Appellant at 22; ***but see id.*** at 23 (wherein Fisher concedes that "there is no case law regarding an explanation of the Rule's explicit language that the court must approve the amendment."). Concerning Rule 560, Fisher avers that the Amended Information violated subsections (B)(5) and (C), and is void as being "substantively defective," because "[i]n all four counts [charged therein (*i.e.*, two counts each of criminal attempt and solicitation,], there is only a description of the inchoate offense and the statutory name to the substantive offense. There are also no references to any specific subsection of the substantive crime." ***Id.*** at 28.

We will first address Fisher's claim as it pertains to Rule 564. This Court has explained that

> [t]he purpose of [] [R]ule [564] is to ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed. When a challenge is raised to an amended information, the salient inquiry is
>
> > [w]hether the crimes specified in the original information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment is not permitted.

***Commonwealth v. Samuel***, 102 A.3d 1001, 1008-09 (Pa. Super. 2014) (citation, quotation marks, and ellipses omitted); ***see also Commonwealth v. Sinclair***, 897 A.2d 1218, 1220-21 (Pa. Super. 2006) (same).

To the extent that Fisher's issue requires us to interpret the language of Rule 564, we are mindful of the following: "When construing a Rule of Criminal Procedure, we utilize the Statutory Construction Act when possible. Pa.R.Crim.P. 101(C). The object of any rule interpretation 'is to ascertain and effectuate the intention of' this Court. 1 Pa.C.S.A. § 1921(a)." ***Commonwealth v. Sepulveda***, 144 A.3d 1270, 1279 n.18 (Pa. 2016). "The object of all interpretation is to ascertain and effectuate the intent of the drafters, a task that is best accomplished by considering the plain language of the provision(s) at issue." ***Commonwealth v. Far***, 46 A.3d 709, 711 (Pa. 2012).

> Further, in interpreting a particular statute [or Rule], we must remain always mindful of the principle that, although one is admonished to listen attentively to what a statute [or Rule] says[,] one must also listen attentively to what it does not say. Accordingly, it is not for the courts to add, by interpretation, to a statute [or Rule], a requirement which the [drafters] did not see fit to include.

***Commonwealth v. Gehris***, 54 A.3d 862, 864-65 (Pa. 2012) (citations and quotation marks omitted).

Contrary to Fisher's claim, the Commonwealth was not mandated by Rule 564 to seek and obtain court approval before filing the Amended Information; the plain language of Rule 564 imposes no such mandatory

duty. Though the Rule provides that a "court *may allow* an information to be amended …," Pa.R.Crim.P. 564 (emphasis added), we disagree with Fisher's interpretation that this language means that the Commonwealth *must* receive express permission from a trial court to amend a criminal information.[4] We are precluded from adding into the Rule a requirement that the drafters did not see fit to include. *See Gehris*, *supra*. Moreover, the Commonwealth's filing of the Amended Information did not constitute an improper "last-minute" addition of charges, violative of the purpose of Rule 564. *See Samuel*, *supra*. Rather, the Commonwealth filed the Amended Information in April 2013, and the case did not proceed to trial until over two years later, thus giving Fisher ample notice and time to mount a defense against the charges. Finally, we agree with the trial court that

> [t]he crimes specified in the original [I]nformation involve the same basic elements[,] and evolved out of the same factual situation[,] as the crimes specified in the [A]mended [I]nformation. [Fisher] is [thus] deemed to have been placed on notice regarding his alleged criminal conduct and therefore[, Fisher] is not prejudiced by this change.

Trial Court Opinion, 5/26/16, at 17 (citing *Sinclair*, *supra*); *see also Samuel*, *supra*.

We also discern no violation of Rule 560. Importantly, Fisher concedes that the Rule explicitly provides that "the omission of or error in such citation[, *i.e.*, to the statute it is alleged that the defendant violated,] *shall*

---

[4] Additionally, Fisher points us to no case law in support of his argument in this regard, nor does our independent research disclose any.

*not affect the validity or sufficiency of the information*." Pa.R.Crim.P. 560(C) (emphasis added); ***see also Commonwealth v. Morales***, 669 A.2d 1003, 1006 (Pa. Super. 1996) (stating that "pursuant to Pennsylvania law, an information is not to be read in an overly technical form. Thus, we will arrest judgment only when an error misleads a defendant as to the charges against him, precludes him from anticipating the Commonwealth's proof, or impairs a substantial right."). Additionally, the content of the Amended Information was sufficiently "specific so as to allow [Fisher] to prepare any available defenses should he exercise his right to a trial." ***Sims***, 919 A.2d at 939; ***see also*** Pa.R.Crim.P. 560(B)(5). Accordingly, Fisher's first issue does not entitle him to relief.

In his second issue, Fisher contends that the trial court erred by denying his Motion to dismiss, asserting that the Commonwealth violated his speedy trial rights under Pa.R.Crim.P. 600. ***See*** Brief for Appellant at 29-41. Fisher summarizes his claim as follows:

> Essentially, … the delay [in bringing his case to trial] began after several of Fisher's [M]otions were not promptly scheduled for a hearing as a result of the Commonwealth's lack of due diligence. [] [A]s a result, the time should be attributed to the Commonwealth, which [results in a] violation of Pa.R.Crim.P. 600 ….

***Id.*** at 33; ***see also id.*** (listing Fisher's five pretrial Motions that allegedly "were not decided or scheduled in a timely fashion"); ***id.*** at 34-35 (asserting that there were delays in scheduling a hearing on Fisher's discovery requests, which should be attributable to the Commonwealth); ***id.*** at 40

(asserting that "the Commonwealth did not demonstrate that it 'exercised due diligence by opposing or responding to the pretrial motion[s].'" (quoting *Commonwealth v. Hill*, 736 A.2d 578, 587 (Pa. 1999))).

We review such claims according to the following principles:

> In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion.
>
> . . .
>
> The proper scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.
>
> Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

*Commonwealth v. Thompson*, 93 A.3d 478, 486-87 (Pa. Super. 2014) (citations, brackets and ellipses omitted).

In its Opinion, the trial court summarized and addressed Fisher's claims concerning his Rule 600 challenge, discussed the relevant law, and determined that the Commonwealth had exercised due diligence in bringing Fisher's case to trial. *See* Trial Court Opinion, 5/26/16, at 18-21. We affirm based on the trial court's rationale with regard to this issue. *See id.*

In his third issue, Fisher argues that the trial court committed an error of law, which caused him unfair prejudice at trial, by precluding defense counsel from cross-examining the victim's mother (and, likewise, the victim) regarding the victim's having allegedly expressed to the prosecutor prior to trial a reluctance to testify (hereinafter referred to as "the purported reluctance comments"). **See** Brief for Appellant at 42-51. Fisher urges that the trial court erred as a matter of law in determining that the purported reluctance comments were privileged communications protected from inquiry. **Id.** at 45-46. According to Fisher, this topic was relevant and material, and defense counsel should have been permitted to cross-examine the victim and his mother on this matter to impeach the victim's credibility. **See id.** at 46-50. Fisher avers that the court's ruling in this regard "allowed the jury not to weigh favorable evidence [to the defense], which certainly would have been useful in the determination of the credibility of [the victim]." **Id.** at 49 (emphasis omitted); **see also id.** at 50 (asserting that cross-examination concerning the victim's reluctance to testify was particularly necessary "especially in light of the alleged discrepancy of the [June 30, 2012] conversation where words were allegedly uttered by Fisher to [the victim].").

"[T]he scope of cross examination is a matter within the trial court's discretion and will not be disturbed absent an abuse of that discretion." **Commonwealth v. Kouma**, 53 A.3d 760, 768 (Pa. Super. 2012) (citation

omitted); *see also Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012) (stating that "in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. … To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." (citation omitted)).

In its Opinion, the trial court addressed Fisher's claim and determined that the court did not err in precluding cross-examination into the purported reluctance comments. *See* Trial Court Opinion, 5/26/16, at 37-41.[5] We agree with the trial court's rationale and determination, and affirm on this basis as to Fisher's third issue, *see id.*, with the following addendum.

Initially, our research has disclosed no on-point case law guidance on this particular matter. Reluctance by minor victims to testify against their assailants in a criminal trial is not uncommon, particularly in cases involving alleged sexual crimes. *See*, *e.g.*, *Commonwealth v. Baldwin*, 502 A.2d 253, 258 (Pa. Super. 1985) (observing that "child sexual abuse victims often … are reluctant witnesses, sometimes refusing to testify or recanting prior allegations out of fear or coercion.") (collecting cases and persuasive authority). We are persuaded by the rationale advanced in the trial court's Opinion that it would be against public policy to permit inquiry into the

---

[5] We observe that wherein the trial court sets forth the relevant portions of the transcript, "Mr. Policicchio" is Fisher's counsel, and "Mr. Carbonara" is the prosecutor.

purported reluctance comments where the victim made these comments to the prosecutor prior to trial. **See id.** at 41.

Nevertheless, even assuming, *arguendo*, that the trial court erred by prohibiting defense cross-examination concerning the purported reluctance comments, an error at trial does not automatically entitle an appellant to a new trial. **Commonwealth v. Reese**, 31 A.3d 708, 719 (Pa. Super. 2011) (*en banc*). "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial. ... Harmless error exists[, in relevant part,] if the record demonstrates [that] ... the error did not prejudice the defendant or the prejudice was *de minimis* ...." **Commonwealth v. Hairston**, 84 A.3d 657, 671 (Pa. 2014) (citations and quotation marks omitted).

Even if Fisher was prejudiced by being prohibited from questioning the victim's mother as to whether the victim had previously expressed hesitation to testify against his neighbor in a criminal trial, such prejudice was *de minimis*. **See id.** This is particularly true where the victim, in fact, chose to testify at trial (which calls into question the relevance of the victim's prior alleged reluctance). Moreover, we determine that even if the trial court had permitted cross-examination into the purported reluctance comments, there is no reasonable possibility that this would have resulted in a different verdict. **See Commonwealth v. Mitchell**, 839 A.2d 202, 214-15 (Pa. 2003) (stating that "[a]n error will be deemed harmless where the appellate

- 11 -

court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless."). Accordingly, we conclude that Fisher's third issue lacks merit.

In his fourth issue, Fisher avers that the trial court erred when it permitted the jury to take into deliberations a handwritten police statement given by the victim on July 3, 2012 (hereinafter "the police statement"). *See* Brief for Appellant at 51-56.[6] Fisher argues that

> the entire case against [him] was based on the testimony of [the victim]. And, the exact words which Fisher is alleged to have used to "solicit" [the victim] are the key to demonstrate the elements of the offenses with which Fisher was charged. … [U]nder the circumstances where there is vigorous debate as to a discrepancy in the testimony, … it is unduly suggestive to the jury to readily accept the version of the testimony offered by a victim when the jury is allowed to read the victim's actual statement.

*Id.* at 53. Fisher concedes that "the publication to the jury of the [police] statement … is not specifically prohibited by Pa.R.Crim.[P.] 646(C),[7] allowing the publication of the statement to the jury to fall within the

---

[6] We note that Fisher does not challenge the admissibility of the victim's written police statement. *See*, *e.g.*, Brief for Appellant at 52 (asserting that "[t]he problem becomes allowing the jury to actually have a written statement of the witness."); *see also* Trial Court Opinion, 5/26/16, at 42 (stating that "[Fisher] did not object at trial, nor in his Motion for New Trial, to [the police] statement being marked [as an exhibit] and used at trial …[; r]ather, [Fisher] takes issue with the statement having been provided to the jury.").

[7] Rule 646 provides, in relevant part, that "[u]pon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C)." Pa.R.Crim.P. 646(A).

discretion of the trial judge." Brief for Appellant at 64 (footnote added). Notwithstanding, Fisher argues that the trial court's ruling was an abuse of discretion. *Id.*

"Whether an exhibit should be allowed to go out with the jury during its deliberation is within the sound discretion of the trial judge." *Commonwealth v. Barnett*, 50 A.3d 176, 194 (Pa. Super. 2012); *see also* Pa.R.Crim.P. 646(A). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill will or partiality, as shown by the evidence of record." *Commonwealth v. Melvin*, 103 A.3d 1, 35 (Pa. Super. 2014). "The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury." *Barnett*, 50 A.3d at 194 (citation omitted). "Our courts have rarely found that materials given to juries during deliberations constitute reversible error. In the cases that have found reversible error, however, the prejudicial effect of the evidence in question was severe and readily apparent." *Id.* (collecting cases).

In the instant case, we do not deem the prejudicial effect (if any) of the police statement to be severe. As defense counsel and the prosecutor pointed out during trial, the police statement contained certain accounts

made by the victim of the events on June 30, 2012, which were both consistent *and inconsistent* with the victim's testimony at the preliminary hearing and trial. **See** Trial Court Opinion, 5/26/16, at 44-46 (setting forth the relevant portions of the trial transcript); **see also id.** at 47 (wherein the trial court found that defense counsel had attempted to impeach the victim through cross-examination concerning "small inconsistent statements" between the victim's testimony and the police statement). Accordingly, the jury's having possessed the police statement did not give it access to information favorable only to the Commonwealth. Moreover, we cannot agree with Fisher that publication of the police statement placed undue emphasis or credibility on the material contained therein. **See Barnett**, 50 A.3d at 194. Therefore, we conclude that the trial court acted within its discretion, pursuant to Rule 646(A), when it denied Fisher's challenge to the jury possessing the police statement during deliberations. **See id.**; **see also Commonwealth v. Causey**, 833 A.2d 165, 178 (Pa. Super. 2003) (stating that under Rule 646 "a prosecution witness's statement entered into trial evidence as an exhibit may be sent out to the jury.").

In his fifth issue, Fisher argues that "the trial court erred in denying his Motion *in Limine* to preclude the admission of an email exchange between [Fisher] and his co-worker[,] because the[] [emails] were irrelevant and highly and unfairly prejudicial." Brief for Appellant at 56. The email

exchange, admitted into evidence at trial, provided, in relevant part, as follows:

> [Fisher's male co-worker]: Did you mow your lawn, the cheerleader, or the redhead that you said you were going to get pics for me to make john jealous?
>
> [Fisher]: Yeah.  I no longer discuss the down-hill neighbors.  Mother's insanity appears to have been passed along in the genes.  Taking pictures of [the victim in the instant case] would probably result in police cars swarming my place.  Besides, the red hair is the only good feature, he's rather odd looking.  I'm seriously considering a fence and video surveillance, so screen shots in the future might be possible.

Commonwealth's Trial Exhibit A (hereinafter referred to as "the email"); **see also** N.T., 8/26/15, at 1.176-77.   Fisher asserts that the email was inadmissible under Pennsylvania Rule of Evidence 403, which provides that "[t]he [trial] court may exclude relevant evidence if its probative value is outweighed by a danger of … unfair prejudice …."  Pa.R.E. 403; **see also** Brief for Appellant at 58-59 (arguing that the email was unfairly prejudicial because "1) it implies that [Fisher] was photographing [the victim]; 2) it implies that [Fisher] found [the victim's] red hair attractive; 3) it implies [that Fisher] looked at [the victim] to evaluate his attractiveness …; [and] 4) it implies that [Fisher] has improper voyeuristic tendencies by noting that he (Fisher) may video[]tape [the victim].").

"A trial court's decision to … deny a motion *in limine* is generally subject to an evidentiary abuse of discretion standard of review." **Commonwealth v. Williams**, 91 A.3d 240, 248 (Pa. Super. 2014) (*en*

*banc*). "Relevance is the threshold for admissibility of evidence." ***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa. Super. 2015); ***see also*** Pa.R.E. 402. "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401; ***see also Tyson***, 119 A.3d at 358 (stating that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact."). Although a trial court may exclude relevant evidence if its probative value is outweighed by a danger of unfair prejudice,

> [e]vidence will not be prohibited merely because it is harmful to the defendant. [E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case …. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]

***Kouma***, 53 A.3d at 770 (citation omitted); ***see also*** Pa.R.E. 403, cmt. (defining "unfair prejudice" as "a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.").

Here, the trial court opined that the email is "clearly relevant" and probative of whether Fisher had propositioned the victim for unlawful sexual contact. ***See*** Trial Court Opinion, 5/26/16, at 34. In particular, the trial court stated that

> [t]he issue in this case was whether [Fisher] propositioned [the victim] for oral sex and made comments to the effect that he found [the victim's] red hair attractive. The email established that [Fisher] had made statements about photographing [the victim], and that he found [the victim's] red hair to be a 'good feature.' [Fisher's] statements make it more probable that [Fisher] found [the victim] attractive, and therefore more likely to have propositioned [the victim].

*Id.* The trial court further found that "the email's relevance was not outweighed by unfair prejudice." *Id.* Moreover, the trial court stated that it "found the jury was capable of determining the extent to which the email corroborated [the victim's] claims, and that the jury was competent to ascertain whether [Fisher's] statements [in the email] were jokes, in earnest, or somewhere in between." *Id.* We agree with the trial court's determinations concerning the admissibility of the email and, discerning no abuse of discretion, conclude that the trial court did not abuse its discretion by denying Fisher's Motion *in limine*. *See Williams*, *supra*.

In his sixth issue, Fisher contends that the trial court abused its discretion by considering improper information in imposing his sentence, including hearsay evidence. Brief for Appellant at 60.

Fisher challenges the discretionary aspects of his sentence, from which there is no automatic right to appeal. *See Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. 2010).

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether the appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether the appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010) (quotation marks and some citations omitted).

Here, Fisher filed a timely Notice of Appeal and preserved the challenge to his sentence in a post-sentence Motion. Fisher also included the requisite Rule 2119(f) Statement in his brief. Accordingly, we will review Fisher's Rule 2119(f) Statement to determine whether he has raised a substantial question.

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

***Commonwealth v. Disalvo***, 70 A.3d 900, 903 (Pa. Super. 2013) (citation omitted); *see also* 42 Pa.C.S.A. § 9781(b).

In his Rule 2119(f) Statement, Fisher argues, in relevant part, as follows:

[T]he trial court committed an abuse of discretion when it considered the [SOAB] Report as a factor in imposing sentence despite the fact that Fisher had never been declared by the court to be a sexually violent predator and, [where] Fisher [had] not participat[ed] in the interview leading to the report[,] the [SOAB

R]eport contained almost nothing but hearsay concerning his background.

Brief for Appellant at 60.

Fisher's claim presents a substantial question. *See Commonwealth v. Shugars*, 895 A.2d 1270, 1274 (Pa. Super. 2006) (stating that a substantial question is presented where the appellant alleges that the sentencing court relied upon impermissible factors in fashioning a sentence).

We review discretionary aspects of sentence claims under the following standard: "[S]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006).

In its Opinion, the trial court addressed Fisher's challenge to his sentence, adeptly summarized the applicable law, and determined that the sentencing court did not abuse its discretion by considering the information contained in the SOAB Report. *See* Trial Court Opinion, 5/26/16, at 51-55. The trial court's cogent analysis is supported by the law and the record, and we discern no abuse of discretion by the court in sentencing Fisher within the standard range of the sentencing guidelines. We, therefore, affirm on this basis in rejecting Fisher's sixth issue. *See id.*

In his seventh issue, Fisher challenges the sufficiency of the evidence supporting his convictions. *See* Brief for Appellant at 11-18.

As a prefatory matter, we consider whether Fisher has waived his sufficiency of the evidence claim. Fisher presented this issue in his court-ordered Rule 1925(b) Concise Statement as follows: "[Fisher] asserts as error that the verdict is against both the weight and sufficiency of the evidence." Concise Statement, 4/15/16, at ¶ 10. In its Opinion, the trial court determined that Fisher had waived the sufficiency claim for his lack of specificity in the Concise Statement. *See* Trial Court Opinion, 5/26/16, at 56-57.

> This Court has observed that
>
> when challenging the sufficiency of the evidence on appeal, the [a]ppellant's 1925 statement must specify the element or elements upon which the evidence was insufficient in order to preserve the issue for appeal. Such specificity is of particular importance in cases where, as here, the [a]ppellant was convicted of multiple crimes[,] each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.

*Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009) (internal citations and quotation marks omitted).

In the instant case, Fisher's Concise Statement fails to specify the element or elements upon which the evidence was insufficient, and failed to specify which convictions he was challenging. Accordingly, Fisher waived this issue. *See id.*; *Commonwealth v. Garland*, 63 A.3d 339, 344 (Pa. Super. 2013) (ruling that the appellant had waived his sufficiency challenge where he "not only failed to specify which elements he was challenging in his Rule 1925(b) statement, [but] also failed to specify which conviction he was

challenging."); *see also Commonwealth v. Veon*, 109 A.3d 754, 775 (Pa. Super. 2015) (vacated on other grounds) (citing *Garland*, *supra*, and finding the appellant's sufficiency challenge waived where he raised this claim as follows in his "sweeping and generalized" Rule 1925(b) statement: "[t]he evidence was insufficient to prove beyond a reasonable doubt that Mr. Veon committed any crime whatsoever.").

In his final issue, Fisher argues that the jury's verdict was against the weight of the evidence, asserting that "the evidence which was heard by the jury shows that the version testified to by Fisher was so clearly of much greater weight than was that presented by [the victim]." Brief for Appellant at 19. Fisher urges that the verdict "shocks the conscience, as there is absolutely no evidence … of any specific conduct or action by Fisher against [the victim], other than idle talk and random conversation." *Id.*

In reviewing Fisher's claim, we are cognizant that

[t]he weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015) (quotation marks and citations omitted); *see also Commonwealth v. Sanchez*, 36 A.3d 24, 27 (Pa. 2011) (stating that "[o]n appeal, [an appellate] Court cannot substitute its judgment for that of the jury on issues of credibility, or that of the trial judge respecting weight.").

In its Opinion, the trial court addressed Fisher's claim and determined that the verdict was not against the weight of the evidence. *See* Trial Court Opinion, 5/26/16, at 55-56. We discern no abuse of discretion in the trial court's determination, nor does the jury's verdict shock our collective conscience. Accordingly, we affirm with regard to Fisher's final issue based on the rationale in the trial court's Opinion. *See id.*

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/20/2017

COMMONWEALTH

) IN THE COURT OF COMMON PLEAS
) OF SOMERSET COUNTY,
) PENNSYLVANIA
)

CARL J. FISHER,

)
)
Defendant. )    NO. 800 CRIMINAL 2012

## OPINION PURSUANT TO Pa.R.A.P. 1925(a)

This opinion is issued in compliance with Pennsylvania Rule of Appellate Procedure 1925(a).

## I. PROCEDURAL HISTORY

On July 2, 2012, Conemaugh Township Police received a report from the mother of a juvenile complainant that Carl J. Fisher ("Defendant") had offered the juvenile ("ZS") money in exchange for oral sex, an offer that ZS had refused. The next day, ZS provided a written statement to police containing these allegations. About three and one-half months later, on October 25, 2012, Detective Michael H. Popma filed a criminal complaint charging Defendant with: Promoting Prostitution of a Minor (18 Pa. Cons. Stat. § 5902(b.1)(3)); Criminal Solicitation (to promote prostitution of a minor) (18 Pa. Cons. Stat. § 902(a)); and Corruption of Minors (18 Pa. Cons. Stat. § 6301(a)(ii)). On December 5, 2012, a preliminary hearing took place before Magisterial District Judge Susan Mankamyer, who dismissed the § 5902(b.1)(3) charge, but held the §§ 902(a) and 6301(a)(1)(ii) charges for court. On January 18, 2013, the Somerset County District Attorney filed a Criminal Information charging Defendant with offenses under §§ 902(a) and 6301(a)(1)(ii).

It would be another two and one-half years before this case would finally make it to trial on August 26, 2015. On the way, the case followed this tortured path:

- <u>February 12, 2013</u>: Defense counsel, Matthew R. Zatko, Esq., requested, and was granted, a continuance because he needed additional time to prepare for trial.

- <u>April 16, 2013</u>: The District Attorney filed an amended Criminal Information in which were added charges of: Criminal Solicitation (Involuntary Deviate Sexual Int.) (18 Pa. Cons. Stat. § 902(a)); Criminal Attempt (Involuntary Deviate Sexual Intercourse) (18 Pa. Cons. Stat. § 901(a)); Criminal Solicitation (Indecent Assault) (18 Pa. Cons. Stat. § 902(a)); and Criminal Attempt (Indecent Assault) (18 Pa. Cons. Stat. § 901(a)).

- <u>April 16, 2013</u>: Defendant pleaded not guilty to all charges.

- <u>April 23, 2013</u>: Defendant, acting *pro se*, filed a Petition for Writ of Habeas Corpus.

- <u>April 24, 2013</u>: We issued an order on continuing the case, since we had been advised that further pre-trial motions were to be filed, and we would be taking these matters under advisement.

- <u>April 25, 2013</u>: Attorney Zatko filed a Motion to Quash Information for Failure to Comply with Pa.R.Crim. P. 544, 564 and 565.

- <u>July 7, 2013</u>: Defendant, acting *pro se,* filed a Motion for Sanctions Against the Commonwealth and to Dismiss All Charges.

- <u>July 22, 2013</u>: Attorney Zatko moved to withdraw as counsel for Defendant based on Defendant having filed *pro se* pleadings, on Defendant having made "allegations and accusations…[via] emails to [Attorney Zatko], causing the attorney-client relationship to be irreparably damaged," and because Defendant failed to cooperate with counsel.

- <u>July 25, 2013</u>: We granted Attorney Zatko's Motion to Withdraw. We scheduled a hearing on the remaining matters for August 27, 2013.

- <u>August 27, 2013</u>: Defendant requested a postponement in order to obtain counsel; we

2

granted this request and postponed the hearing to September 10, 2013.

- <u>September 6, 2013</u>: Attorney Joseph Policicchio entered his appearance for Defendant.

- <u>September 9, 2013</u>: Defendant again moved to continue the case on the grounds: "Counsel was engaged in this matter on September 6, 2013. Due to the complex nature of the case, counsel requires additional time to prepare for [the] same." We granted the request and postponed the hearing for October 30, 2013.

- <u>September 9, 2013</u>: Defendant also signed a Pa.R.Crim.P. 600 waiver and requested a postponement of the case from the October Criminal Court Term to the next term.

- <u>September 12, 2013</u>: We granted Defendant's request for postponement.

- <u>October 30, 2013</u>: We heard argument on Defendant's Motions for Sanctions, to Quash the Amended Information, and for Writ of Habeas Corpus. On that date, we denied the Motion for Sanctions, and took the remaining issues under advisement.

- <u>November 20, 2013</u>: We denied the Defendant's remaining motions.

- <u>December 5-6, 2013</u>: Defendant signed another Rule 600 waiver and requested a continuance of the case from the January criminal trial session to the March term, which we granted on December 6.

- <u>December 16, 2013:</u> Defendant filed an application asking us to amend our Order denying his Habeas motion so as to grant him permission to seek an interlocutory appeal.

- <u>December 19, 2013:</u> We denied the Defendant's application to amend.

- <u>February 11, 2014</u>: Defendant indicated that a discovery request had gone unresolved, so we scheduled argument on Defendant's Motion for Discovery for February 27.

- <u>February 27, 2014:</u> We granted a continuance and directed the parties to meet and

3

attempt to resolve the issues raised in Defendant's motion within thirty days.

- **April 15, 2014:** Defendant again pleaded not guilty.

- **April 23, 2014:** Defendant moved for dismissal pursuant to Rule 600. We indicated that we would continue the trial, upon Defendant's filing of a Rule 600 waiver, in order to resolve Defendant's Motion to Dismiss. Defendant requested the continuance and submitted a Rule 600 waiver on May 5, 2014, on which date we allowed the case to be postponed to the next criminal trial term.

- **September 24, 2014:** We heard argument regarding Defendant's Rule 600 motion and took the matter under advisement, which required postponement of the case to the next criminal trial term.

- **December 9, 2014:** We again continued the case because Defendant's motion was still under advisement.

- **December 19, 2014:** We directed the parties to complete time-line calculations and submit them to us by January 16, 2015. Both parties complied on January 16, 2015.

- **February 10, 2015:** Because the Rule 600 matter was still under advisement, we continued the case until the next term of court.

- **March 17, 2015:** We denied Defendant's Rule 600 motion.

- **March 27, 2015:** Defendant filed a Motion for Reconsideration.

- **April 9, 2015:** Defendant, acting *pro se,* filed a Motion to Disqualify the Somerset County District Attorney's Office from Participation in this Prosecution.

- **April 10, 2015:** Defendant, acting *pro se,* filed a Motion to Quash Amended Information for Violating Pa.R.Crim.P. 560(B)(5). On that date, April 10, 2015, we denied the Motion for Reconsideration, and the presiding judge at the time, then-

4

President Judge Cascio, recused himself from the case.

- <u>April 15, 2015</u>: We advised defense counsel by letter that we would not be considering Defendant's *pro se* motions because represented criminal defendants have no right to file *pro se* pleadings.

- <u>May 20, 2015</u>: Defense counsel subsequently "adopted and joined" in Defendant's two *pro se* motions. Defendant, through counsel, filed an Omnibus Pre-Trial Motion, apparently incorporating Defendant's prior *pro se* motions and raising new issues. We scheduled hearing on Defendant's Omnibus Motion for June 9, 2015.

- <u>May 28-29, 2015</u>: Defendant requested a continuance because defense counsel had "already been scheduled to be out of Somerset County for another hearing" on June 9, 2015. We granted the continuance on May 29 and rescheduled the hearing for June 17, 2015.

- <u>June 17, 2015</u>: The parties jointly moved to continue the hearing on this date because of their inability to secure the presence of necessary witnesses. The hearing was rescheduled for June 30, 2015.

- <u>June 23, 2015</u>: Defendant, acting *pro se,* filed an Objection to Transcript alleging certain errors in the transcript of the proceedings that occurred on February 11, 2014.

- <u>June 25, 2015</u>: We scheduled this case for trial to occur on August 26 and 27, 2015.

- <u>June 30, 2015</u>: We held a hearing on Defendant's Omnibus Pre-Trial Motion, and took the matter under advisement.

- <u>July 21, 2015</u>: We issued our decision on Defendant's Omnibus Pre-Trial Motion.

- <u>August 21, 2015</u>: Defendant filed a Motion in Limine, which we denied on August 26, 2015.

5

The case proceeded to jury trial on August 26, 2015. Defendant was found guilty on all counts on August 27, 2015. Sentencing was scheduled for November 12, 2015. On September 16, 2015, we ordered that Defendant be assessed by the Sexual Offenders Assessment Board.

On October 27, 2015, Defendant filed a Motion for New Trial, and defense counsel concurrently filed a Motion to Withdraw. On November 5, 2015, we heard argument on the Motion for New Trial and took the matter under advisement. On that date, we also continued argument regarding defense counsel's Motion to Withdraw to November 10, 2015. On November 9, 2015, we denied Defendant's Motion for New Trial and rescheduled sentencing for November 19, 2015. On November 10, 2015, we granted defense counsel's Motion to Withdraw upon completion of the sentencing hearing.

On November 18, 2015, Defendant moved for Assignment of Legal Counsel, which we denied. On November 19, 2015, prior to sentencing, Defendant made an oral Motion for Extraordinary Relief, which as we noted, was in the nature of a Motion for Judgment of Acquittal due to insufficiency of the evidence. We denied the oral motion and proceeded to sentencing. For the offense of Solicitation to Commit IDSI, we sentenced Defendant to four to eight years' incarceration in a state correctional institution; for the offense of Corruption of Minors, Defendant was sentenced to six months to seven years incarceration to be served concurrently with the Solicitation sentence;[1] and the offenses of Criminal Attempt to Commit IDSI, Solicitation to Commit IDSI, and Criminal Attempt to Commit Indecent Assault merged for sentencing purposes.

On that date, we also granted Defendant additional time to file post-sentence motions.

---

[1] We originally sentenced Defendant to six months to eight years, but we realized our error at the sentencing hearing, and issued an Amended Sentencing Order on that same date.

6

On November 23, 2015, we ordered the Public Defender's Office to assign counsel to Defendant. Defendant filed his post-sentence motion on December 8, 2015, which we denied on February 29, 2016. Defendant had also demanded new court-appointed counsel, which we denied on the same date.

Defendant's Notice of Appeal was filed on March 29, 2016. We ordered Defendant to file a 1925(b) statement on March 24, with which Defendant complied on April 15, 2016.

## II. FACTUAL HISTORY

Defendant is a fifty-six year old single man whose place of residence was 181 North Red Drive, Johnstown, Pennsylvania. Trial Tr. 2.220-21, Aug. 27, 2015. He was employed as a Financial Conditions Examiner with the Pennsylvania Insurance Department, and had been so employed since 2005. *Id.* at 2.221-22. Prior to that he had been an auditor with the Defense Department, but had also held odd-jobs such as delivering pizzas and working at Idlewild Park. *Id.* at 2.222.

ZS resided at 183 North Red Drive, Johnstown, Pennsylvania, 15905 which was situated next door to Defendant's home. Trial Tr. 1.107-08, Aug. 26, 2015. ZS made Defendant's acquaintance years prior when ZS had taken a trip to the amusement park Idlewild, where Defendant worked. *Id.* at 1.108. This may have been as far back as 2004. *Id.* at 1.135. After that, ZS had other interactions with Defendant; for example, whenever ZS and others would ride their bicycles outside, Defendant "would always be there pumping tires up and stuff like that, doing yard work." *Id.* at 1.109; Trial Tr. 2.252-53, Aug. 27, 2015. Beginning around the age of twelve, ZS would also perform yard work for Defendant, such as raking leaves and shoveling snow. Trial Tr. 1.110, 1.111, Aug. 26, 2015. Other children in the neighborhood also performed services for Defendant including ZS' sister. *Id.* at 1.110-12.

7

Defendant paid ZS for doing chores around the residence. *Id.* at 1.111.

After a year or two of performing tasks such as raking leaves, ZS began mowing Defendant's lawn. *Id.* at 1.112. Defendant would pay ZS forty dollars for two or three hours' worth of raking leaves. *Id.* at 1.113. ZS would receive the same wage for mowing the lawn. *Id.* ZS considered these sums to be generous. *Id.*

ZS recalled that around this time, he had observed Defendant engaging in behavior ZS believed to be odd, e.g., while playing hockey in his yard outside, ZS observed Defendant watching him from a vantage point in Defendant's laundry room. *Id.* at 1.114. During some of these occasions, ZS would make eye contact with Defendant, which indicated to ZS that Defendant knew ZS had seen Defendant watching him. *Id.*

Defendant was generally friendly to ZS, and they had never argued. *Id.* at 1.116. However, ZS testified that his mother had laid down ground rules vis-à-vis Defendant: never go inside of his house, and never go over to Defendant's residence when ZS' mother was not home. *Id.* at 1.115. Still, ZS' mother apparently let ZS perform yard work, and she allowed ZS to approach Defendant about purchasing fundraiser items. *Id.* And whenever ZS or his sister would ask Defendant about purchasing such items, Defendant would give them larger bills and allow them to keep the change; for example, an item might cost seven dollars, and Defendant would give them a ten-dollar bill and allow them to keep the change. *Id.* at 1.134-35; Trial Tr. 2.240-41, Aug. 27, 2015. In 2010, Defendant gave ZS and his sister Christmas gifts of fifty dollars each. Trial Tr. 1.136, Aug. 26, 2015; Trial Tr. 2.258-59, Aug. 27, 2015. Defendant also gave Christmas gifts to other children in the neighborhood. Trial Tr. 1.137-38, Aug. 26, 2015. Defendant once encountered ZS and his family at a restaurant, Old Toll Gate Inn, and paid for their meal. *Id.* at 1.133-34; Trial Tr. 2.243-45, Aug. 27, 2015.

8

ZS had approached Defendant about mowing Defendant's lawn in order for ZS to earn money to spend during an upcoming family trip to Florida. Trial Tr. 1.141, Aug. 26, 2015. ZS mowed Defendant's lawn thrice prior to the trip. *Id.* at 1.141-42.

ZS recounted the events of June 30, 2012:

> June 30th, I went over to Carl's and knocked on his door because we were going on vacation to Florida and I wanted to ask him when I should mow before we left. And he's like: Whenever, I'll be home all week. I go, Okay.
>
> I was getting ready to leave and Carl asked me if he could ask me a question, if I wanted to…earn more money; I said, Sure. And he said he had a friend about my age before and they would give each other blow jobs. And he wanted to know if we could do that and he also told me he liked red hair. […] He told me: If so, just to name the price. […]
>
> I said no and ran off his porch…into my house…[w]ent inside, slammed the door behind me and went to my room.

*Id.* at 1.116-17. This occurred around three in the afternoon. *Id.* at 1.119. ZS was fourteen years old at the time. *Id.* at 1.117. Defendant did not pull his wallet out, show ZS any money, advance on ZS, touch, or attempt to touch, ZS. *Id.* at 1.160.

Although ZS' mother was home at the time, ZS did not immediately tell her about these events. *Id.* at 1.118. He decided not to tell her then because he did not feel comfortable disclosing that this had happened. *Id.* at 1.119. After he went to his room, ZS played video games and watched television; he could not recall whether he ate supper with his mother and sister. *Id.*

ZS later went to bed: "It was around 3:00 [a.m.]. And I'm laying in bed just thinking [about] what Carl said to me. I felt uncomfortable knowing that I had to live beside him, and so I went back to my mom's room crying and told her what had happened, that we had to talk, and told her what he said to me." *Id.* at 1.120. Afterward, his mother "tried to get me to calm

9

down and everything, went back, woke my sister up, told her what was going on; and we kind of sat up for a little bit after that; and we went to bed; and then in the morning, she tried figuring out like what to do…about everything." *Id.* at 1.121.

ZS remembers his mother making calls the next day as she attempted to figure out how to proceed. *Id.* at 1.122. The Monday after this incident, ZS was interviewed by Detective Popma, and ZS communicated these events to the detective and also prepared a written statement. *Id.*

After charges were filed against Defendant, ZS observed Defendant ordering food at the McDonald's ZS worked at, and Defendant would make eye contact with ZS which made ZS feel a palpable sense of tension. *Id.* at 1.124-25. ZS also believed Defendant was following him on a separate occasion. *Id.* at. 1.125.

Since the incident, ZS had given "the finger" to Defendant multiple times. *Id.* at 1.130-31. ZS would make this gesture to Defendant when ZS was on his porch and he saw Defendant "in his house[,] staring out the window." *Id.* at 1.131. ZS also directed his middle finger at Defendant because Defendant had placed a camera on top of the air conditioner connected to his window, which was oriented toward ZS' house. *Id.* at 1.167.

Brad Harker is an attorney employed by the Human Resources Department of Defendant's former employer, the Pennsylvania Insurance Department ("the Department"). *Id.* at 1.174. When the Department was notified of the charges pending against Defendant, it followed its policy of immediately suspending employees and investigating them. *Id.* at 1.175. The Department's staff confiscated Defendant's laptop and requested that the Office of Administration provide "a capture of all of his e-mail and the Internet [sic] activities." *Id.* at 1.175-76. Once suspended, Defendant filed for unemployment compensation. An

10

unemployment compensation hearing was held, at which point, Mr. Harker had the opportunity to question Defendant under oath. *Id.* at 1.176.

One of the e-mails the Department recovered was sent between Defendant and one of his co-workers the morning of August 13, 2012:

> [Co-worker]: Did you mow your lawn, the cheerleader, or the redhead that you said you were going to get pics for me to make john [sic] jealous?
>
> [Defendant]: Yeah. I no longer discuss the down-hill neighbors. Mother's insanity appears to have been passed along in the genes. Taking pics of Zachary would probably result in police cars swarming my place. Besides, the red hair is his only good feature, he's rather odd looking. I'm seriously considering a fence and video surveillance, so screen shots in the future might be possible. [....]

Com.'s Ex. A, Aug. 26, 2015; Trial Tr. 1.177-78. At the unemployment compensation hearing, Defendant admitted that he had authored this e-mail. Trial Tr. at 1.181. Defendant however explained the e-mail by indicating that it was a joke based on his knowledge that his homosexual friend "liked redheads." *Id.* at 1.183. Defendant admitted at trial to writing this e-mail. Trial Tr. 2.292, Aug. 27, 2015. His stated rationale remained the same: it was a joke to tease his friend's boyfriend. *Id.* at 2.295.

Defendant explained that he suffered an injury (a rupture of his "talar tendon") in late 2004, and in 2006 he began seeking help with his yard work from children in the neighborhood because he had had surgery to "partially fix the talar tendon," which had put him in "a cast for a week and a half, then an immobilizer...Eventually, [it] could be adjusted to allow more movement until it...was functional." *Id.* at 2.232-34. From that point on, he employed neighborhood children, up to the date of the incident, to perform various outdoor tasks.

11

Defendant agreed that an exchange occurred between him and ZS on the date of the incident, and their two accounts shared substantial points of agreement, but there was disagreement as to the exact words Defendant spoke, and their context:

> Q: [...] So let's go back to what happened on June the 30th then. [ZS] knocked. Did you come out on the porch?
>
> A: Not immediately...But then I stepped outside, went to a neutral corner of the porch, leaned against the railing, looked out on the lawn, saw a few drops of water, and I said that he could probably mow today if he wanted...he could mow in maybe an hour or so, just let it dry a little bit more, if he wanted....
>
> Q: All right, go ahead.
>
> A: Um, and [ZS] responded much too quickly that he was thinking he would want to mow on the third...I thought maybe he was worried about getting paid, so I told him before that...I wouldn't be traveling that first week of July. So I assured him that whenever he wanted to do it before he went on vacation is fine with me and I would be there to pay.
>
> Q: Did you think it was unusual that he wanted to come back on the third as opposed to doing it Saturday, the 30th?
>
> A: Yes. We had a pattern going; and since the job was going to be over, he would mow on the 30th; and I would go back to doing it myself on the seventh because he would be in Florida and the job was done.
>
> [...]
>
> Q: What conclusion did you come to?
>
> A: Um, well, first, the conclusion that this was getting to be a little weird conversation here because...from my own experience over the years, you don't set a specific day to mow around here because that's the day when it's going to be pouring down rain.
>
> Q: He was dictating the days to you, the dates?

A: Yes, and I kind of took offense to that.

Q: [W]ere you getting the sense from him that not only did he want to mow on the third, but he was planning on coming…back the following week?

A: Well, yes…that's the conclusion that I came to eventually. I really didn't come to that conclusion until I asked how long he was going to be gone on vacation. But that wouldn't work because he was going to be gone two weeks, but he told me one week. And then the pieces fell together…I put it [all together] and I realized that I think I had been snookered.

[…]

Q: So what was your reaction? What did you do? What did you say?

A: Well…I figured I should probably express my displeasure in some way to that attitude…I mean, he basically [was] taking something that should have been in my control and actually lied to me because he said he wanted to know when he should mow. He didn't say: I've got this idea that I could mow on this date and then we can work around vacation that way. I might have…liked that idea, but…I didn't like being lied to. And I concluded that he was trying to cheat me out of another $40.

Q: What happened then?

A: Um, well, he kind of started to walk away and say he would see me on the third; and I said, or anytime before you leave. And I asked him to come back so I could ask him a question. And I didn't want to falsely accuse him of something, so I asked him: Is this about, um, a way to make more money?

[…]

A: He said yeah. Um, so I had a little dilemma there because he was honest about trying to cheat me, I thought, but he had tried to cheat me. So I—I told him that there had been an incident—well, I gave a short version of this, but I got to do the long one or you won't understand it.

13

When I had moved in in 1994, a few months afterwards, a police officer, who I believe lived up at the end of my street...named David Grattan—and I didn't know his name; I had researched it to get the—the name—David Grattan had been arrested for sexual misconduct with mid-teenage boys by...letting them have beer parties, buying them cigarettes, giving them some marijuana and propositioning them. The news article said touching their legs inappropriately. The rumor mill actually told me it was much worse than that, but Grattan...was fired. I actually remembered that from back in 1994.

So basically I made the comment to Zachary that—you know, a long time ago, boys your age would go have a good time and have oral sex for money. Um—and I finished up with a rhetorical question: Do you really want to be like that?

[...]

Q: [W]hy...was [it] that you made that comment or that statement?

A: Well, I wanted [ZS] to understand my displeasure with the fact that he had essentially lied to me about wanting to know when I...wanted him to mow and then basically disregarding my response about mowing that day; and secondly, once I concluded that his reason was that he wanted to earn another $40...I just don't like that kind of dishonesty and I considered it—um, well, basically, a situation where people will do anything for money—you know, lie, cheat somebody; and especially since I've been especially nice to them, especially nice, well, I guess four weeks in even giving [ZS] that job.

[...]

A: Okay, um, but basically—you consider that good conduct, bad conduct, morally equivalent—you know, that some people would do anything for money would do and just compare—comparing to that situation that I was starting to describe—you know, where the boys would do anything for money for that Officer Grattan.

Q: Now, Carl, were you intending on scaring [ZS] at all?

14

A: No, I don't think so. I think I—you know, just informing him that some conduct is kind of unacceptable. And I'll be honest, was it badly phrased? Yes. Could I have done better with more time? Sure. But this was just spur of the moment and he seemed anxious to leave, but I did want to express my discontent with his actions.

Q: Did you use the word "blow jobs"?

A: I believe I used the phrase "oral sex."

Q: Did...you say something to the effect: Name your price?

A: No.

Q: Did you in any manner solicit any kind of sexual favors for money?

A: No. I had no such intent and I didn't.

*Id.* at 2.270-82. Defendant denied that he said anything about liking redheads, and that no one came to see him afterward to figure out whether there had been some kind of misunderstanding. *Id.* at 2.282-84. As Defendant stated,

What happened on June 30th? I think [ZS] truly believed at first that I had said something inappropriate. I'm not going to deny that it was poorly phrased, but—you know, after 12 hours at 3:30 in the morning, I think he pieced together the comment about liking redheads from a month before and his own impressions I am sure he thought he heard from his mother over the years and he came up with that and he genuinely scared himself a little bit.

*Id.* at 2.307. Later, however, Defendant asserted that Detective Popma "is quite a liar," that ZS' mother "can't remember a lot of stuff very well," and that "[ZS] is a liar on some things." *Id.* at 2.316. Defendant alleged that ZS made inconsistent statements at the preliminary hearing, statements ZS knew to be false, and he indicated that he wanted "to point out that Mr. Carbonara [the prosecuting attorney], C███ S███ [the mother], and Michael Popma were essentially [ZS'] handlers before the Preliminary Hearing; and most likely, people who

15

would suborn his perjury." *Id.* at 2.323. Defendant, based on his beliefs that the District Attorney's Office and Detective Popma had engaged in misconduct, and, as Defendant stated, "I believe that a crime had occurred and I am clearly the victim of it," Defendant filed multiple private criminal complaints, which we discuss further *infra*.

## III. ANALYSIS

### 1. Pre-trial Errors.

#### A. Denial of Defendant's Motion to Quash the Information and Second Motion to Quash the Amended Information.

Defendant asserts that we erred "in denying [his] Motion to Quash the Information and Second Motion to Quash the Amended Information[,] permitting the criminal charges on the amended information to be put before the jury despite its amendment in violation of Pa.R.Crim.P. 560 by being amended without leave of court and by the descriptions associated with each charge lacking specific facts." Def.'s Statement of Matters Complained of Pursuant to Rule 1925(b) ¶ 4(a), Apr. 15, 2016.

Defendant's Motion argued that,

> Although the Pennsylvania Rules of Criminal Procedure are silent as to a definition for "offense," Black's Law Dictionary defines offense specifically as being, "A violation of the law; a crime, often a minor one." Thus, under Rule 564 the amended information cannot include a new crime, unless there was a defect in form, description, or date charged.

Def.'s Mot. to Quash ¶¶ 9-12, April 25, 2013. Defendant argued that because "four new crimes" were added to the Information, and there was no "defect in form of the original information," no amendment was permitted. He also asserted that the procedure for amending information, as contained in Pa.R.Crim.P. 565(a), was not followed. *Id.* at ¶¶ 13-14.

16

We denied Defendant's Motions to Quash, and stated our reasons, via Order on November 20, 2013:

> Defendant's Motion to Quash Amended Information is DENIED. The crimes specified in the original information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended information. Defendant is deemed to have been placed on notice regarding his alleged criminal conduct and therefore Defendant is not prejudiced by the change. *See Commonwealth v. Sinclair*, 897 A.2d 1218 (Pa. Super. 2006) (citing *Commonwealth v. Davalos*, 779 A.2d 1190, 1194 (Pa. Super. 2001)).

Order, Nov. 20, 2013 (Geary, P.J.). Defendant filed a second Motion to Quash Amended Information, this time *pro se*, on April 10, 2015, in which he alleged that no factual basis had been given for the additional charges, and therefore, the District Attorney is not "complying with ethics standards." We indicated to Defendant's counsel by letter on April 15, 2015, that we would not be considering Defendant's *pro se* pleading:

> Dear Attorney Policichio [sic],
>
> I enclose for your consideration copies of two motions that were recently filed *pro se* by Carl J. Fisher. As you are aware— though Mr. Fisher seemingly is not—a represented criminal defendant has no right to file *pro se* pleadings. *Commonwealth v. Ellis*, 626 A.2d 1137 (Pa. 1993). This being the case, I intend to take no further action on the enclosed motions at this time.

Correspondence, Apr. 15, 2015 (Geary, P.J.). While we believe that these are sufficient grounds to support our denial of Defendant's Motions to Quash, we also note that on May 20, 2015, Defendant, through counsel, filed an Omnibus Pre-Trial Motion in which he sought to dismiss various counts of the Amended Information for substantially the same reasons as previously argued. To the extent that the arguments Defendant made in his Omnibus Pre-

17

Trial Motion relate back to the Motions to Quash, we addressed them in our July 21, 2015 Memorandum, which we reproduce in relevant part below:

> Defendant argues here that the Commonwealth improperly amended the Information to add four offenses, and therefore, the new offenses should be dismissed and the DISTRICT Attorney sanctioned. We addressed this issue back in October 2013 when we decided *Defendant's Motion to Quash Amended Information*. By Order dated November 20, 2013, we denied Defendant's motion[,] holding that Defendant was not prejudiced by the amendment because the added offenses arose from the same factual situation and contain the same basic elements as the initial charges. *See, Commonwealth v. J.F.*, 800 A.3d 942, 945 (Pa. Super. 2002), *appeal denied*, 812 A.2d 1228 (holding that when the original indictment or information rise out of the same basic elements and factual situation as the amended indictment or information, the defendant is deemed to have been placed on notice regarding his alleged criminal conduct). Having previously decided this issue, we have no intention of revisiting it now.

Memorandum and Order 4, Jul. 21, 2015 (Geary, P.J.)

### B. Alleged Rule 600 Violation.

Defendant next asserts that the "trial court failed to dismiss the case for violation of Rule 600." On April 23, 2014, Defendant filed a Motion for Dismissal Under Rule 600. Hearing on this matter occurred on September 24, 2014, after which hearing, we took the matter under advisement. On December 19, 2014, we ordered the parties to brief this matter, and the parties complied on January 16, 2015. Defendant essentially argued that delays arising out of his discovery requests should be charged against the Commonwealth, despite the fact that many of the continuances had been requested by Defendant. *See*, Def.'s Supp. Br. Rule 600 Calc., Jan. 16, 2015. Defendant additionally argued that the onus of scheduling a hearing on his discovery requests was on the Commonwealth pursuant to local rules of

18

court, not Defendant; therefore, delay attributable to a failure to file a scheduling praecipe should count against the Commonwealth for Rule 600 purposes.

We denied this Motion by Order of March 27, 2015, and stated our reasoning in a Memorandum accompanying the Order, which we reproduce in its entirety:

> This matter is before us on Defendant's Motion for Dismissal Under Rule 600. For the reasons which follow, the Motion is denied.
>
> As we understand Defendant's argument, because the Commonwealth failed to assure that certain pending discovery motions were scheduled for hearing, all delay in this matter commencing on or about April 23, 2013 should be chargeable to the Commonwealth. We disagree.
>
> Neither the Pennsylvania Rules of Criminal Procedure nor our local rules place the burden of scheduling a hearing or argument on the Commonwealth. Pa. R. Crim. P. 577 provides, in pertinent part:
>
> > A) Following the filing of a motion,
> > 
> > \* \* \*
> >
> > (2) if the judge determines the motion requires a hearing or argument, the court or the court administrator shall schedule the date and time for the hearing or argument. Pursuant to Rule 114(B)(2), notice of the date and time for the hearing or argument shall be served by the clerk of courts, unless the president judge has designated the court or court administrator to serve these notices.
> >
> > B) The judge promptly shall dispose of any motion.
> >
> > C) Unified Practice. Any local rule that is inconsistent with the provisions of this rule is prohibited, including any local rule requiring a personal appearance as a prerequisite to a determination of whether a hearing or argument is scheduled.
>
> Pa. R. Crim. P. 577.
>
> Our local Som. R. Crim. P. 574 governing scheduling, cited by Defendant, also provides

19

B. All argument cases shall be scheduled for argument or hearing only upon the filing of a scheduling Praecipe in the form specified in Som. R.J.A. 1099, available through the Court Administrator's office or Prothonotary's office, except the following argument cases, which shall be scheduled, sec reg., by the Court Administrator without a scheduling Praecipe:

\* \* \*

2. Motions, petitions and applications for pretrial relief, including motions to quash, discovery motions, motions for pretrial conference, motions to suppress, omnibus pretrial motions and the like. Such matters shall first be filed with the Clerk of Courts who shall promptly transmit the same to the Court Administrator. If the case is on the criminal trial list for the coming trial session, all such motions shall be scheduled for disposition as soon as possible, and in all events before the scheduling conference held preceding the trial session. Otherwise, such matters shall be scheduled sec reg.

Som. R. Crim. P. 574.

While it is clear that the scheduling provisions of local rule 574 B are contrary to the provisions of Rule 577(A)(2), pursuant to Rule 577(C) the scheduling requirements of Rule 577 govern. Under Rule 577(A)(2), scheduling is the responsibility of the Court and not the Commonwealth. Accordingly, the delay in scheduling hearings on the pending discovery motion is solely the responsibility of the Court and cannot be assessed against the Commonwealth for Rule 600 purposes. *See Commonwealth v. Bradford*, 616 A.2d 122 (Pa. 2012). The Comment to the current version of Rule 600 also provides guidance in this regard.

> Delay in the time for trial that is attributable to the judiciary may be excluded from the computation of time. *See, e.g., Commonwealth v. Crowley*, 502 Pa. 393, 466 A.2d 1009 (1983). However, when the delay attributable to the court is so egregious that a constitutional right has been impaired, the court cannot be excused for postponing the defendant's trial and the delay will not be excluded. *See Commonwealth v. Africa*, 524 Pa. 118, 569 A.2d 920 (1990).

Pa. R. Crim. P. 600, *Comment*.

20

As mentioned above, the delay which we must evaluate deals with the failure of the Court to schedule argument on Defendant's pending motion for additional discovery. As noted by the Defense, once the issue regarding the pending discovery motion was raised at the Call of the Criminal trial List on February 11, 2014, we ordered that a hearing be scheduled which was held on February 27, 2014. At that hearing we directed counsel to attempt to resolve the relevant discovery issues outstanding within the next 30 days. The within Motion to Dismiss was filed on April 23, 2014. Despite our directive, it appears that counsel have failed to address the discovery issues further.

Because we find that the delay is the responsibility of the Court rather than the Commonwealth, discussed *infra*, we reject Defendant's argument that, despite the waivers filed by Defendant, all delay from April 16, 2013 must be assessed to the Commonwealth. Accordingly, Defendant's [M]otion to Dismiss is denied. We will order a prompt additional hearing on the discovery issues.

Memorandum and Order, Mar. 17, 2015 (Cascio, J.)

### C. Our Denial of Defendant's Motion to Disqualify the District Attorney's Office.

Defendant also alleges that it was error for us to decline to "disqualify the District Attorney's office despite [D]efendant's assertion that the District Attorney's Office was biased against [D]efendant resulting from his private criminal complaint filings against members of the District Attorney's Office Staff...." Def.'s Statement ¶ 4(c).

Defendant first sought disqualification of the DA in a *pro se* motion filed on April 9, 2015. He alleged in his motion the following:

On December 16, 2014 the Defendant filed a Private Criminal Complaint, on the D.A,'s [sic] form, asserting that the D.A. and others have engaged in and/or attempted official oppression, obstruction of justice, criminal coercion, theft by extortion, and acts of intimidation and retaliation against him as a victim of, and witness to, other felonies and misdemeanors perpetrated by police, witnesses, and prosecutors.

21

The Defendant believes and avers that probable cause exists to support the criminal prosecution of the D.A. and others for their acts and failures to act, as outlined in the private criminal complaint...[which complaint alleged that because of a] failure of the D.A. to either approve or disapprove, without unreasonable delay, a private criminal complaint filed by the Defendant...against the Complainant [ZS] and others alleging that the Complainant fabricated testimony at the Preliminary Hearing...in order to save this malicious prosecution from being dismissed....D.A. approval or disapproval of such complaints is required by Pa.R. Crim. P. Rule 506(A).....

The D.A. is conflicted in regards [sic] to this prosecution for at least two reasons:

a. There is probable cause to prosecute Lisa Lazzari-Strasiser for several felony and misdemeanor offenses for her failure to either approve or disapprove the...private criminal complaint...[which] effectively halts the prosecution of the Complainant for perjury because it prevents the Defendant from requesting the court to review her disapproval of the complaint and unreasonably delays prosecution if she should approve the complaint. These offenses and the possible criminal sanctions imposed for them create a clear conflict that can only be alleviated by disqualifying the D.A.'s office.

b. The evidence of the D.A.'s obstruction of the January 28, 2014 private criminal complaint shows that Mrs. Lazzari-Strasiser and her employees are aware that the Complainant's testimony is fabricated, at least in part. As such, the Defense intends to call her and/or her employees as our witness at future trials/hearings to be held in this case, which creates a clear conflict of interest caused by her criminal conduct.

Def.'s Mot. to Disqualify, Apr. 9, 2015.

As we indicated *supra*, we informed Defendant's counsel that we would not be reviewing *pro se* filings, since Defendant was represented by counsel and accordingly had no

right to file *pro se* pleadings. Defendant's trial counsel subsequently "adopted and joined" in this motion, and, in any event, Defendant re-hashed these claims through counsel in his Omnibus Pre-Trial Motion. *See*, Def.'s Omnibus Pre-Trial Mot. 8-9, May 20, 2015.

We addressed this argument in our July 21, 2015 Memorandum, which we excerpt in relevant part:

> Defendant asserts here that the District Attorney has failed to approve or disapprove several private criminal complaints he filed in the District Attorney's office. Defendant further asserts that he plans to call the District Attorney as a witness in his trial, apparently to question the District Attorney about the veracity of the juvenile complainant. According to Defendant, these pending issues create a conflict that disqualifies the District Attorney from prosecuting his case any further. Defendant claims that the case should be referred to the Attorney General's Office for prosecution. We disagree.
>
> First, this argument is partially moot, as the District Attorney has in fact made a determination on Defendant's private criminal complaints. Second, the private criminal complaints have no relevance to the charged offenses in this case. Lastly, the "conflict" complained of here was created by the Defendant himself through his filing of several private criminal complaints and his stated intention to call the District Attorney as a witness for what is plainly an improper reason.
>
> We are aware of no constitutional provision, statute, rule or case that would allow a defendant to effectively choose his preferred prosecutor by creating conflicts for the prosecutor he wishes to avoid. Therefore, Defendant's Motion to Disqualify the Somerset County District Attorney and her Assistants is DENIED.

Memorandum and Order 5-6, Jul. 21, 2015 (Geary, P.J.)

## D. Denial of Defendant's Habeas Petition.

Defendant contends that we erred "in denying the defendant's Motion for Writ of Habeas corpus [sic] by failing to hold a de novo hearing and finding that there was sufficient

23

evidence to establish a prima facie case on each of the charges as alleged in the Information and the Amended Information...." Def.'s Statement ¶ 4(d).

In Defendant's Petition, he cited 18 Pa. Cons. Stat. §§ 103 and 301 to argue that "the requirement for the Defendant to be convicted would be that he performed a voluntary bodily movement as part of the offense; that the Criminal Complaint does not "indicate that the Defendant performed any voluntary bodily movement"; that the statements attributed to Defendant in the Criminal Complaint's accompanying Affidavit of Probable Cause are "ambiguous and do not inevitably lead to the conclusion reported by the Complainant"; and that, in essence, because there was no "bodily movement" (i.e., anything other than alleged verbal conduct), "the evidence fails to support that even a single 'Act' occurred, much less two or more. Therefore the Commonwealth has clearly failed to meet their burden to present evidence that this crime has been committed." Def.'s Pet. for Writ of Habeas Corpus ¶¶ 9, 11-18, Apr. 23, 2013. Argument regarding Defendant's Habeas petition occurred on October 30, 2013.

We denied Defendant's Petition by Order of November 20, 2013:

> Defendant's Motion for Writ of Habeas Corpus is DENIED. Our review of the evidence presented convinces us that there is sufficient *prima facie* evidence to allow each count of the information to be submitted at trial. *See Commonwealth v. Barclay*, 62 Som.L.J. 297 (2005).

Order, Nov. 20, 2013.

Defendant, through counsel, filed an Application for Amendment of Interlocutory Order on December 16, 2013, in which he argued that he was entitled to a de novo hearing under Somerset County Court of Common Pleas precedent. He cited primarily to

24

*Commonwealth v. Marker*, 41 Som.L.J. 138, 141 (Pa. Com. Pl. Ct. 1982). We denied Defendant's "application" on December 19, 2013.

We first want to draw attention to Defendant's selective citing of our precedents: while we did hold in *Marker* that "[i]n the habeas corpus proceeding on the issue of a prima facie case, the court must hear the testimony de novo rather than decide upon the basis of testimony at the preliminary hearing," it is hardly the case that "the practice in Somerset County has always been that in habeas corpus proceedings the Court...must hear testimony de novo rather than decide upon the basis of testimony at the preliminary hearing." Def.'s Application 2. *Marker* held that a de novo review was required, and *Commonwealth v. Lindeman*, 61 Som.L.J. 30, 36 (Pa. Com. Pl. Ct. 2003) also held such. However, the other case Defendant cited in support of his proposition, *Commonwealth v. Sigmund*, 60 Som.L.J. 231, 245 (Pa. Com. Pl. Ct. 2002) does not present the same holding; in fact, there, where the defendant challenged whether a prima facie case had been established at the preliminary hearing, we stated, "The Court will determine whether the Commonwealth has established a prima facie case...**based upon its review of the transcript of the preliminary hearing which has been provided to the Court.**" (Emphasis added).

We note that both *Marker* and *Lindeman*, which support de novo review, cite to the same case for this proposition: *Commonwealth ex rel Johnston v. Walker*, 25 Som.L.J. 70, 75 (Pa. Com. Pl. Ct. 1970). *Walker* cites, for this proposition, *Commonwealth ex rel Alberti v. Boyle*, 195 A.2d 97 (Pa. 1963) as well as a volume of Standard Pennsylvania Practice. *Boyle* dealt with a Habeas petition the defendant filed in order to "be admitted to bail," pursuant to Pa. Const. Art. I, § 14. The Court held that, "In application for bail in a homicide case, a decision should be made on the basis of the testimony which is presented by the

25

Commonwealth at that hearing, and, of course, under the pertinent tests hereinabove set forth." 195 A.2d at 400.

Thus, *Boyle*'s holding did not lend itself to such an expansive reading as that extracted from it by *Walker*; and *Boyle* itself is clearly distinguishable from the case *sub judice*. Therefore, we do not consider the cases Defendant cites—which themselves cite only to *Walker*—to be binding precedent. Rather, we consider ourselves in line with *Sigmund* in which a review of the preliminary hearing transcript was performed. We have found no appellate authority that mandates a *de novo* review.

Because the Commonwealth was entitled to rest on the transcript of the preliminary hearing, which we reviewed and found established a *prima facie* case against Defendant, we rejected Defendant's contention that he was entitled to a *de novo* review of the evidence.

### E. Denial of Defendant's Writ of Mandamus.

Defendant claims it was error to deny his Writ of Mandamus that was "filed in an attempt to require the Commonwealth to approve or disapprove the private criminal complaints filed by defendant." Def.'s Statement ¶ 4(e).

The "writ of mandamus exists to compel official performance of a ministerial act or mandatory duty...Mandamus cannot issue to compel performance of a discretionary act or to govern the manner of performing [the] required act." *Coppolino v. Noonan*, 102 A.3d 1254, 1263 (Pa. Commw. Ct. 2014) (internal quotations and citations omitted). Courts may issue the writ "where the petitioners have a clear legal right, the responding public official has a corresponding duty, and no other adequate and appropriate remedy at law exists." *Id.*

Firstly, we note that our perusal of this case file reveals no Petition for Writ of Mandamus. However, in regard to the private criminal complaints discussed *supra*, which

26

Defendant filed against ZS, Detective Popma, and the District Attorney, a Petition for Writ of Mandamus was filed on June 3, 2015, and docketed separately from the case *sub judice*. Def.'s Pet. for Writ of Mandamus, No. 88 MD 2015.

That Petition referenced private criminal complaints filed against ZS for perjury, "and other crimes" against Detective Popma for making "deliberate false statements"; against the District Attorney for "her criminal obstruction of petitioner's private complaint...to conceal the perjury referred to in that complaint, among other crimes"; and against the District Attorney for her "conspiracy...to continue to obstruct justice by rejecting [the former private criminal complaint against her] without investigation or review." Def.'s Pet. for Writ of Mandamus ¶ 3, No. 88 MD 2015, Jun. 3, 2015.

We wrote elsewhere that defendant's "private criminal complaints have no relevance to the charged offenses in this case." Memorandum 6, Jul. 21, 2015. Defendant's Petition certainly alleges misconduct that pertains to the criminal charges in this case. However, Defendant's assertions that ZS had lied, that Detective Popma had made false statements, etc., insofar as they are relevant to the defense, all could have been—and, as the record reveals, indeed were—delved into at trial through cross-examination and Defendant's own testimony once he took the stand.

Defendant's Petition concerned his attempt to compel the District Attorney to file charges arising from his private criminal complaints; therefore, the Writ pertains to the District Attorney's performance of her official duties vis-à-vis those private criminal complaints, and is not relevant to the charges she had already filed against Defendant. To the extent that the Petition contains underlying allegations that are relevant to his defense, Defendant was permitted to raise those issues at trial, and in fact did. Moreover, Defendant's

27

various allegations of misconduct (directed at virtually every participant in this case) have been engaged with in some depth in his pre-trial motions, as illustrated herein.

In sum: Defendant's Petition is docketed separately, has its own distinct, albeit brief, procedural history, and the relief it seeks is independent of the criminal charges that had been filed against him. Furthermore, the factual averments in that Petition, insofar as they are relevant to the defense, were ruled upon in pre-trial motions, and Defendant again raised these issues at trial before the jury. Therefore, we submit that our denial of Defendant's Petition is improperly raised in this appeal.

### F. Denial of Various Requests for Relief Presented in Defendant's Omnibus Pre-Trial Motion.

Defendant's first three assertions of error here all rely on an alleged lack of probable cause supporting Defendant's arrest, which he alleges consequently made his arrest illegal, as well as everything flowing from that arrest:

> [T]he trial court erred in denying the request for relief as detailed in defendant's Omnibus Pretrial Motion in the following respects: 1) by denying the Motion to Dismiss and Quash the Arrest Warrants because there was a lack of probable cause and the prosecution retaliated due to defendant's refusal of the ARD offer; 2) by denying the Motion to Suppress even though there was no probable cause to arrest and the evidence obtained was illegally obtained as a result; 3) by denying the Motion to Dismiss the Amended Information despite the illegal arrest....

Def.'s Statement ¶ 4(f)(1)-(3). We explained our rationale for each of these rulings in our July 21, 2015 Memorandum accompanying the Order:

> **A. Motion to Dismiss All Charges and to Quash Arrest Warrants**
>
> Defendant argues that probable cause was not established for his arrest, and as a result all evidence collected after the arrest should be suppressed. We disagree. The testimony of the

28

arresting officer and the written statement provided by the juvenile complainant established reasonable grounds to believe that a crime had been committed by Defendant. *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) ("Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that[] an offense had been or is being committed.")

Citing *Commonwealth v. Rocco*, 544 A.2d 496 (1988), Defendant also argues that the Commonwealth engaged in vindictive prosecution by amending the Information to add four offenses. According to Defendant, the Information was amended in retaliation for his having refused the Commonwealth's offer for Accelerated Rehabilitative Disposition (ARD). Defendant offered no evidence to support this assertion. The Assistant District Attorney asserted that the Commonwealth's intent to amend the Information was formed around the time of the preliminary hearing; that is, well before Defendant had refused the Commonwealth's offer.

We find Defendant's claim to be without merit. To begin with, a prosecutor's pre-trial charging decisions do not, as a general rule, trigger a presumption of prosecutorial vindictiveness. *Commonwealth v. Chamberlain*, 30 A.3d 381 (Pa. 2011). Moreover, the United States Supreme Court has held that due process rights are not violated when a prosecutor pursues more serious offenses after an accused decides not to plead guilty to the originally charged offense. *Bordenkirchner v. Hayes*, 98 S.Ct. 663 (1978). In this case, the Commonwealth added offenses after Defendant refused an offer to be placed on ARD. The Commonwealth has asserted that Defendant's refusal of ARD had no bearing on the decision to amend the Information. We accept the Commonwealth's assertion as true; however, we wish to note that even if the ARD refusal had been the impetus for the Amended Information, the *Bordenkirchner* decision makes it clear that no constitutional violation would result. For these reasons, Defendant's Motion to Dismiss All Charges and Quash Arrest Warrants is DENIED.

## B. Motion to Suppress Evidence Illegally obtained

The Court having concluded in Section A that Defendant's arrest was supported by probable cause, Defendant's Motion to Suppress Evidence Illegally obtained is DENIED.

29

### C. Motion to Dismiss Various Counts of the Information

> The Court having concluded in Section A that Defendant's arrest was supported by probable cause, Defendant's Motion to Dismiss Various Counts of the Amended Information, which is based on the presupposition that the arrest was invalid, is DENIED.

Memorandum and Order 2-4, Jul. 21, 2015 (Geary, P.J.).

Defendant's fourth and fifth assertions of error pertain, respectively, to our denial of his "Motion to Dismiss and Motion for Sanctions despite the Information being improperly amended," and our denial of his "Motion to Dismiss and Motion for Sanctions despite the Commonwealth's coercion, extortion, and official oppression it exercised by amending the Information." Def.'s Statement ¶ 4(f)(4), (5). We addressed these issues in *supra* section III(1)(A) and directly above.

Defendant's sixth allegation is that we erred in denying his motion to disqualify the District Attorney's Office, "despite the office's failure to make a decision on private criminal complaints filed by the defendant regarding members of the Office. [sic]" Def.'s Statement ¶ 4(f)(6). We addressed this issue *supra* in section III(1)(C).

Defendant, in his seventh sub-subsection, alleges that we erred "by denying the defendant's request to dismiss the case pursuant to Pa.R.Crim.P. 600." Def.'s Statement ¶ 4(f)(7). We addressed this issue *supra* in section III(1)(B).

### G. Defendant's Objection to Transcript.

Defendant claims it was error to not "permit[] a hearing on the defendant's Objection to Transcript filed June 23, 2015[,] despite defendant's claims that the 2/11/14 transcript was falsified." Def.'s Statement ¶ 4(g).

30

On June 5, 2015, Defendant filed an Application for Order to Transcribe Record for the Call of the Criminal Trial List that occurred on February 11, 2014. We ordered the record transcribed on June 5, 2015, and on June 9, 2015, a transcript of the proceedings was filed. On June 23, 2015, Defendant filed a *pro se* Objection to Transcript in which he alleged that "the information in the transcript has been falsified to fabricate defenses against the disqualification and criminal prosecution of Mrs. Lazzari-Strasiser in the matters described [above in this motion]."

We had previously (on April 15, 2015), informed defense counsel that we would not be taking any action on *pro se* filings. Subsequently, however, Defendant argued that, pursuant to Somerset Rule of Judicial Administration 5000.14(C)(4), he was entitled to a hearing on his Objection to the transcript. This is not the case.

Somerset Rule of Judicial Administration 5000.14(C) applies to "[c]ontested proceedings in which testimony is transcribed (including jury trials, nonjury trials, criminal and civil, law and equity, contested adoption and relinquishment proceedings, contested guardianship proceedings, contested mental health proceedings, and the like)." Transcripts for contested proceedings are required to be lodged with the Prothonotary or Clerk of Courts, during which period objections to the transcript may be filed. Som.R.J.A. 5000.14(C)(2)-(4). If a timely objection is filed, the presiding judge "shall cause the objection to be scheduled for hearing and argument..." Som.R.J.A. 5000.14(C)(5)(b).

In this case, the transcript at issue was not a transcript of a "contested proceeding" (that is, it was not a proceeding in which testimony was taken); therefore, the procedures set forth in Som.R.J.A. 5000.14(C)(5)(b) do not apply in this instance. Moreover, we note that defense counsel was present at the February 11, 2014 Call of the Criminal Trial List, and was

31

fully capable of bringing the matter to the court's attention if he, in consultation with his client, determined that there was an (alleged) inaccuracy in the transcript.

In sum, Defendant was not entitled to file this objection *pro se*; our local rules of judicial administration provide no authority for filing objections to proceedings that are not contested proceedings; and defense counsel, who had been present at the proceeding, was able to bring this issue to our attention, but did not. For these reasons, we found that Defendant's Objection lacked merit.

### H. Defendant's Motion in Limine.

Defendant next contends that we erred "in denying defendant's Motion in Limine to preclude the e-mail exchange between he and his co-worker under the Pennsylvania Rules of Evidence despite their irrelevance and highly prejudicial nature...." Def.'s Statement ¶ 4(h).

On August 21, 2015, Defendant, through counsel, filed a Motion in Limine to exclude evidence of the e-mail exchange that had occurred between Defendant and Keith Wandel, in which Defendant referenced, *inter alia*, taking photographs of ZS, as well as ZS' red hair. Defendant argued that under Pa.R.E. 403, "the probative value of any such evidence is outweighed by a danger of unfair prejudice, confusion of the issues, and misleading the jury." Defendant also claimed that the e-mails may be offered "as evidence of other 'wrongs' or 'other acts', all of which is not admissible to prove the Defendant's character in order to show that on June 30, 2012, he acted in accordance with any such character...." We heard argument on Defendant's Motion in Limine on August 26, 2015, the first day of the trial.

Defendant argued, "I'm not sure what the Commonwealth is doing. My recollection is...if you're trying to show M.O. and motive, these would be incidents that would occur prior to the time of the alleged event. But we don't have that here. We have a conversation that

32

occurred...longer than two weeks, two months after he was confronted by the police and given some indication as to what was going on. Maybe this is a joke...." Trial Tr. 1.8-9, Aug. 26, 2015. Defendant also claimed that all of the statements in the e-mail were prejudicial. *Id.* at 1.9. The e-mail "has no direct relevance to the incident that occurred on June 30th. I think it's all prejudicial." *Id.* at 1.10.

The Commonwealth argued that the e-mail was relevant as it is evidence that "could reasonably show that a fact is slightly more probable than it would appear without the evidence." *Id.* at 1.11. As the Commonwealth stated,

> The testimony of [ZS] in this case...is going to be that he was propositioned; he went over to speak to Mr. Fisher about mowing his lawn; and it was at that time that the allegation is that Carl Fisher...propositioned him...and...Mr. Fisher's comment to [ZS] was, after soliciting him for oral sex, was...I like redheads....
>
> Your Honor, the e-mails show that the defendant had an interest in the victim, an unhealthy interest in a 14-year-old red-headed boy. And I think it...lends credence to [ZS'] statement that it is not in a vacuum...that Carl Fisher had an interest in [ZS] and that that statement likely could have occurred.

It makes it, as McCormick said, slightly more probable.

*Id.* at 1.11-12. The Commonwealth noted that the standard is "unfair prejudice," and argued that standard had not been met. *Id.* at 1.12. Defendant then reiterated that the e-mail is "highly prejudicial. I think...if it's relevant, it's so marginally relevant that to put it in is going to be unfair and prejudicial to this defendant." *Id.* at 1.14.

Questions as to the admissibility of evidence are soundly within the discretion of trial courts, and may only be reversed upon a showing of abuse of discretion. *Commonwealth v. Belknap*, 105 A.3d 7, 9-10 (Pa. Super. Ct. 2014). We determined that the e-mail exchange is clearly relevant under Pa.R.E. 401, which states that evidence is relevant if "(a) it has any

33

tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

The issue in this case was whether Defendant propositioned ZS for oral sex and made comments to the effect that he found ZS' red hair attractive. The e-mail established that Defendant had made statements about the possibility of photographing ZS, and that he found ZS' red hair to be a "good feature." Defendant's statements make it more probable that Defendant had found ZS attractive, and therefore more likely to have propositioned ZS.

Pursuant to Rule 402, "All relevant evidence is admissible, except as otherwise provided by law." However, relevant evidence may be excluded where "its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. As the comment to the rule indicates, "'unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." We found that the jury was capable of determining the extent to which the e-mail corroborated ZS' claims, and that the jury was competent to ascertain whether Defendant's statements were jokes, in earnest, or somewhere in between. Therefore, the e-mail's relevance was not outweighed by unfair prejudice.

Defendant also argued that the e-mail constituted prohibited evidence of "Crimes, Wrongs or Other Acts," prohibited under Rule 404(b). Unfortunately, Defendant was specific in neither his Motion, nor at the pre-trial hearing, as to what about the e-mail exchange constituted, or referenced, a "crime, wrong, or other act." The inculpatory statements Defendant made to Wandel cannot themselves be the bad acts, otherwise a Defendant's

34

subsequent inculpatory statements would never be admissible. Therefore, it seems to us that the alleged bad acts are those referenced in the e-mail.

However, we believe that there are no crimes, wrongs, or other bad acts contained within the e-mail. Specifically, the e-mail alludes to prior discussion between Wandel and Defendant as to possibly taking pictures of ZS, and that Defendant finds ZS' red hair to be a "good feature." However, contemplation, and even discussion, of taking photos of ZS, no matter how improper it might be, is not a prior crime, wrong, or other bad act; therefore, this evidence is not subject to a Rule 404(b) analysis.

In *Commonwealth v. Luster*, 71 A.3d 1029, 1050 (Pa. Super. Ct. 2013), the appellant had been tried and convicted for murder based on his having thrown the victim out of his car on a highway, causing the victim was struck and killed by an automobile. At trial, the Commonwealth produced a witness who testified that he lived in the apartment where victim lived with her boyfriend, and that once the victim's boyfriend would leave the apartment, the appellant would arrive, after which the appellant and victim would often argue.

The appellant argued on appeal that this testimony was "inadmissible evidence of Appellant's prior bad acts." *Id.* The Superior Court concluded that "there is no merit to Appellant's argument. Indeed, we fail to see how [the] testimony could be characterized as evidence of 'prior bad acts.' [The witness] merely testified that Appellant and the victim often argued...nothing in [his] description of the couple's arguments referenced physical abuse or violence." *Id.* In other words, a statement otherwise properly admitted at trial that references a defendant's conduct does not necessarily reference "prior bad acts," even if that conduct may be detrimental to the defense.

In the instant case, Defendant's conduct amounts to much less than that in *Luster* insofar as the conduct referenced was mere discussion between the two parties about Defendant's intent to take photographs of ZS, and discussion is not a prior bad act. We therefore did not find that Defendant's discussions about photographing ZS, or finding his red hair to be attractive, constituted "crimes, wrongs, or other acts" within the meaning of the Rule.

## I. Denial of Defendant's Request for Change of Venue.

In his last assertion of pre-trial error, Defendant asserts that we erred in denying his request for a change of venue. Def.'s Statement ¶ 4(i).

Defendant had, in his Omnibus Pre-Trial Motion, requested a change in venue. May 20, 2015 ¶¶ 26-27. In our July 21, 2015 Memorandum, we deferred this request until the time of jury selection. Voir dire commenced on August 10, 2015; the parties were able to select a jury without issue; and Defendant did not thereafter renew his motion for change of venue.

Pa.R.Crim.P. 584(a) provides that we may issue an order for change of venue "when it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending." However, as case law makes clear, "[t]he grant or denial of a change of venue is a matter within the sound discretion of the trial judge, who is in the best position to assess the community atmosphere and judge the necessity for a venue change." *Commonwealth v. Pursell*, 495 A.2d 183, 187 (Pa. 1985) (internal citations omitted).

We recognize that "pre-trial prejudice is presumed" in certain situations, such as where "(1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior criminal record, if any,

36

or it refers to confessions, admissions, or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports," *Id.* However, none of these circumstances were present in this case, and no evidence of such was submitted; rather, Defendant only made conclusory allegations of prejudice. And, in any event, "[t]he publicity must be so extensive, sustained and pervasive without sufficient time between publication and trial for the prejudice to dissipate, that the community must be deemed to have been saturated with it." *Id.* This was not the case. We therefore denied Defendant's Motion for Change of Venue.

## 2. Trial Errors.

### A. Admission of Defendant's E-mail.

Defendant alleges, again, that we erred in "ruling that the e-mails between defendant and his co-worker were admissible despite them being irrelevant and unfairly prejudicial (see 4g, above [sic]). Def.'s Statement ¶ 5(a). As Defendant's own statement illustrates, this issue has already been raised, and we have accordingly already addressed it. *See, supra* § (III)(1)(h).

### B. Denial of Defendant's Request to Question the Complainant Despite New Information as to his Willingness to Testify.

Defendant next alleges that "the trial court erred in denying defendant's request to question the complainant immediately prior to trial regarding his intentions to testify and dismissal of the charges despite new information as to his willingness to testify." Def.'s Statement ¶ 5(b). This matter was addressed on the record, which we reproduce in relevant part:

> Mr. Policicchio: [...] My—my question is this—and—you know, if this boy indicated—if he indicated that he does not want to pursue this, he

37

doesn't want to go any further, that bears on his credibility. When he comes into the District Attorney's Office and discusses the matter, I'm not concerned about what he was instructed by the D.A....I think I'm allowed to inquire as to the mother as to whether or not she was involved in the decision-making process as to whether or not he should proceed...

You know, the question is—and I think it's—I think it's a fair question—did [ZS] call the D.A.'s office? Is he the one that indicated that he didn't want to pursue it?

Mr. Carbonara: I...guess my point is: I don't know how it's relevant. The case was scheduled for today. He's here to testify. I don't see how conversations leading up to trial between myself and the victims about whether he wants to move forward and the reasons why he may or may not want to go forward, why they are going to become an issue at trial?

Mr. Policicchio: I'm not intending...to get involved in any type of conversations that occurred between Counsel for the Commonwealth and this victim...I think it bears on this boy's credibility if he has expressed that he doesn't want to proceed with this thing. I think it's a fair question

[...]

The Court: I think that that might be a fair question.

[...]

Mr. Carbonara: So what are you going to ask him: Have you expressed to your mom and the District Attorney that you don't want to pursue this?

Mr. Policicchio: I think that's a fair question.

Mr. Carbonara: That's a conversation with me and I'm stuck having to explain it and I think that's unfair

38

to me that I have to be the one now to divulges it [sic]. If he's going to ask the question: Did you ever tell anybody that you don't want to move forward and then he walks away and it's floating out there, now I'm stuck trying to explain privileged material.

The Court: Good point.

Mr. Policicchio: I don't see, Judge, how the issue of privilege has any—any bearing on this issue at all. We...see these circumstances all the time. We see domestic assault cases. Woman said that husband struck her. During the course of time, she'll make a statement to other people saying: Yeah, I don't want to...pursue [this]...you can infer from that that not wanting to pursue something means that either it didn't happen or that what might have been said before is not credible...we have that happen all the time. We cross-examine people on that basis all the time.

And he can certainly get on the stand and explain it away. He can certainly say: I got cold feet or I was afraid that someone would question me too hard or what have you. But I think it's a fair question.

Mr. Carbonara: So I disagree. I think the fact that I divulged to my colleague that I may have a witness who contacted our office about having cold feet, I think I'm stuck explaining it away. I don't think that's fair.

The Court: And in the end, it is still a conversation between an alleged victim and the Commonwealth's attorney. That is a discussion between them. And I disagree, that's privileged. That's privileged. Just like the discussions that you have with your client...We are going to stand in recess. I'll ponder this during recess. Before we bring the jury back, I will come in and announce my decision.

39

[…]

The Court:      During the recess, of course, I had an opportunity to look at some of the legal authority and what I think this case comes down to is this analysis; and I say this….

In every criminal case before the case goes to trial, there is a discussion that takes place between the Commonwealth and the defendant or Defense Counsel. Those discussions are driven by what the alleged victim is telling the Commonwealth and what the defendant is telling his defense attorney.

For the victim…that decision is one that requires them to consider whether they want to testify, whether they want to go through the discomfort of having to get on the stand and so on.

For the defendant, the decision often is do they accept the plea offer, things like that.

Now, my view is all of that discussion between the Commonwealth and Defense Counsel, driven by what the alleged victim and the defendant are telling their attorneys, is protected. It…can't be pierced. And what I think we're going to be doing here, if I allow these questions to be posed to this particular witness, the alleged victim's mother or the victim himself, is that I am allowing those discussions to be pierced.

And so for that reason, I am not going to allow the defendant to continue to probe those areas.

Trial Tr. 1.97-1.104, Aug. 26, 2015.

To the extent that it is not clear from our foregoing comments on the record, we wish to clarify that we considered the disclosures made prior to trial between prosecution and defense

40

counsel to be part of the pretrial negotiations that take place in virtually every case. In our view, frank disclosures of this type, when made between counsel, should be protected as a matter of public policy. In this regard, we draw the Court's attention to Pa.R.E. 408 which prohibits certain uses of "statement[s] made during compromise negotiations". Pa.R.E. 408(a)(2). We suggest that the disclosures made in this case are akin to "statements made during compromise negotiations", and as such, the disclosures should receive like protection.

### C. Permitting ZS' July 3, 2012 Statement to go to the Jury.

Defendant argues that it was improper to allow ZS' statement, which he made to police on July 3, 2012, to go to the jury as an exhibit. Com's Ex. B, Aug. 26, 2015. At trial, defense counsel objected to the admission of Exhibit B: "I find it unusual to allow a statement—his version is as he testified to on the witness stand. So for that reason, I object to the entry of the statement. I had no objection to it being labeled as something that he could be confronted with, but I...don't know that that would be proper to put his statement in. He's already testified." Trial Tr. 1.211, Aug. 26, 2015. We admitted Exhibit B over Defendant's objection.

Defendant later amplified this objection in his Motion for New Trial, in which he argued,

> The Court erred by allowing the Commonwealth to enter the Complainant's sworn statement dated July 3, 2012 into evidence over a defense objection that it is hearsay, *Commonwealth v. Jubilee*, 403 Pa. Superior Ct. 596, 589 A.2d 1112 (1991). Hearsay is inadmissible and therefore should have been given no weight in the jury's deliberations. Under Pa.R.E. Rule 613(c)(2) the statement was properly used by the Commonwealth as a prior consistent statement in an attempt to rehabilitate the Complainant's testimony at trial after defense counsel impeached the Complainant's trial testimony with the Complainant's inconsistent testimony at the preliminary hearing. The Commonwealth exceeded this allowable use of the statement by submitting it as a trial exhibit.

41

Def.'s Mot 1-2, Oct. 27, 2015. Our understanding is, therefore, that Defendant did not object at trial, nor in his Motion for New Trial, to ZS' statement being marked and used at trial, that is, there is no objection to the Commonwealth having "confronted" ZS with his prior consistent statement in order to rehabilitate his testimony which had been impeached. Rather, Defendant takes issue with the statement having been provided to the jury.

*Jubilee* does in fact state all that Defendant cites. However, we believe that case is distinguishable from the case *sub judice*. In *Jubilee*, the victim, a six-year old girl, had been raped by her uncle. *Id.* at 1113. The first time the girl attempted to report the incident to her mother, the girl was "ignored." *Id.* Later, mother questioned the girl about the incident and the girl twice denied that she had been abused. *Id.* Still later that same day, the girl admitted to her mother that the abuse had occurred, and the girl subsequently made the same reports to two social workers and a police officer. *Id.*

The girl was "vigorously cross-examined," and admitted that she had initially been "reluctant to tell her mother," because of threats her uncle had made. *Id.* After the girl finished testifying, the Commonwealth presented testimony by the two social workers and police officers as to statements that the girl had made to them regarding the assault. *Id.* The defendant appealed the admissibility of the girl's prior consistent statements.

The Superior Court presented an overview of applicable law, as cited by Defendant, before going on to apply that law to the case before it:

> Here, the victim admitted that she had initially told her mother that she had not been assaulted. She explained that she had done so because of her fear of appellant. The admission of the statements detailing the assault which the victim made to two social workers and a police officer, therefore, could not properly be offered to deny the fact that the victim had made inconsistent statements. Similarly, the testimony of the two social workers

42

and the policeman did not explain why the victim had given inconsistent statements. Instead, the Commonwealth used these witnesses to provide testimony which was cumulative of the victim's testimony and thereby intended to bolster the victim's credibility by demonstrating that she had told a version of events consistent with her trial testimony more often than she told the inconsistent version of events. Such a use of prior consonant statements exceeds the limited purpose for which they are allowed. When the trial court allowed the prior consonant statements for such a purpose, it abused its discretion and committed an error of law.

*Jubilee*, 589 A.2d at 1117 (emphasis added). So *Jubilee* involved admission of prior consistent statements to rehabilitate the witness who had made prior statements that were not only inconsistent, but which actually denied the entire incident. Furthermore, those prior consistent statements had been made *after* the inconsistent statements, therefore, they had no real rehabilitative value since they had not been made prior to the inconsistent statements.

However, where witness testimony has been impeached based on other grounds, admission of prior consistent statements is entirely appropriate: "The principle exception to the general rule of exclusion is that prior consistent statements may be admitted to corroborate or rehabilitate the testimony of a witness who has been impeached, expressly or impliedly, as having a faulty memory, or as having been induced to fabricate the testimony by improper motive or influence." *Commonwealth v. Hunzer*, 868 A.2d 498, 512 (Pa. Super. Ct. 2005) (internal citation omitted).

As courts subsequent to *Jubilee* have noted, "*Jubilee* is distinguishable [because it] involves a prosecutor's attempt to use prior consistent statements to bolster a witness who provided a contradictory version of the facts...here, the Commonwealth utilized the victim's prior consistent statements to rebut an inference of recent fabrication arising during cross-examination." *Id.* at 513.

43

In this case, ZS was subject to impeachment during cross-examination where defense counsel attempted to demonstrate that ZS had testified at trial to details that he had not testified to at the preliminary hearing, though Defendant also broached the subject of the prior consistent statements:

Q: Isn't it true that in that transcript [of the preliminary hearing which occurred on December 5, 2012] you make no mention whatsoever about Mr. Fisher saying that you [sic] like red hair?

A: It may have been possible.

Q: Well, may—is it possible? What is it? Is it true or is it possible?

A: I don't remember if I said that in the transcript or not.

Q: Well, we are going to take a look...but if I were to tell you that it was not in the transcript, would you be surprised by that?

[...]

A: Yes.

[...]

Q: Just keep reading. That's your testimony. You show me—I want you to show me where you testified on December 5, 2012, that Carl said he liked red hair.

[The Commonwealth stipulates to the absence of that testimony in the record rather than having ZS continue to read the transcript to look for something that is not there.]

Q: So you agree that you did not testify at the Preliminary Hearing about Carl liking your red hair, is that right?

A: Correct.

Q: Now, in your written statement, you indicate that after you had this conversation with Carl, that "he said he liked redheads; I said, no, and I ran off his porch." Do you remember that in your written statement?

44

A: Yeah.

[...]

Q: [At the preliminary hearing,] [y]ou said: "I said no and walked away."

A: Correct.

Q: So in the written statement, you said you ran away; in the transcript...you walked away. Did you run away or did you walk away?

A: I ran away.

Trial Tr. 1.152-54, Aug. 26, 2015.    These questions came on the heels of a line of questioning as to whether Defendant had complimented ZS' hair not on the porch during this incident, but in a prior, more appropriate, situation:

Q: Do you remember having a discussion with...Ryan and Dakota Thomas about you not having a bicycle and Carl then coming and speaking to you folks? Do you remember that?

A: About me not having a bicycle?

Q: Yeah.

A: No.

Q: Do you remember having a conversation with Ryan teasing you about your hair color?

A: Yeah.

[...]

Q: Do you remember Ryan teasing you about your hair color and asking you what you do when people call you pumpkin head? Do you remember that?

A: No.

Q: Okay. What was he teasing you about?

45

A: Just red hair.

Q: All right. So...when he was teasing you about your red hair, isn't it true that Carl said: I like the color of Zack's hair. There's nothing wrong with Zack's hair color.

A: I don't remember.

Q: You don't remember him saying that?

A: No.

[...]

Q: But you don't remember Carl saying anything about: Hey, there's nothing wrong with Zack's hair; I like red hair?

A: No.

Q: You don't remember him saying that?

A: I don't.

Q: Could have said it, but you don't remember?

A: Could have.

*Id.* at 1.144-46.

Later, defense counsel returned to the apparent discrepancy between ZS' testimony at the preliminary hearing and his earlier statement:

Q: Is [what you testified to at the preliminary hearing] the same as what you said in your statement?

A: No.

Q: What's different about it?

A: I left out some details.

Q: You left out some details where?

A: About the red hair, the name your price.

46

*Id.* at 1.158.

As we noted *supra*, "prior consistent statements may be admitted to corroborate or rehabilitate the testimony of a witness who has been impeached, expressly or impliedly, as having a faulty memory, or as having been induced to fabricate the testimony by improper motive or influence." *Hunzer*, 868 A.2d at 512 (internal citation omitted). Moreover, "[i]t is not necessary that the impeachment be direct; it may be implied, inferred, or insinuated either by cross-examination, presentation of conflicting evidence, or a combination of the two." *Id.* (internal citation omitted).

We found that Defendant, through cross-examination, attempted to impeach ZS by drawing out small "inconsistent statements," such as the run/walk distinction, and that Defendant impliedly impeached ZS' ability to recollect whether the red hair remarks Defendant made had actually occurred during this incident or previously; and, therefore, prior consistent statements were admissible to rehabilitate ZS. *See also, e.g.,* Trial Tr. 2.322, Aug. 27, 2015. We believe these circumstances justified admission of ZS' prior consistent statement.

In *Hunzer*, the Superior Court noted that the victim there had not "provided a contradictory version of the facts," *contra Jubilee*; moreover,

> Review of the record indicates the character of appellant's impeachment was such that the trial court could reasonably exercise its discretion to permit admission of evidence of prior consistent statements to corroborate the child victim's impeached testimony...The victim was subjected to extensive cross-examination in an attempt to discredit her recollection of the incident in question...[the defendant] questioned [the victim] about inconsistent statements the victim had given during interviews...Moreover, [the defendant] indirectly impeached the victim's testimony through his denial [of her account].

47

868 A.2d at 513.

We submit that this case is much closer to *Hunzer* than *Jubilee*. It is similar to *Hunzer* in that Defendant attempted to impeach ZS by way of cross-examination focused on inconsistencies between his testimony and his prior statements. This case is dissimilar to *Jubilee* in that ZS had never denied to anyone that the events occurred. Moreover, as we noted *supra*, Defendant seemed to agree at trial, and even in his Motion for New Trial, that the statement was properly used as a prior consistent statement. Rather, he took issue only with the statement being provided to the jury.

However, once it is determined that the prior consistent statement is admissible, "it [is] within the trial judge's discretion to determine if the jury [can] take the written statement with it." *Commonwealth v. Whyatt*, 340 A.2d 871, 875 (Pa. Super. Ct. 1975). Moreover, an abuse of discretion is the required showing to justify reversal. *Id.* Pa.R.Crim.P. 646(A) also supports our ruling: "Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C)." Rule 646(C) precludes the jury from having (1) a transcript of any trial testimony; (2) a copy of any written or otherwise recorded confession by the defendant; (3) a copy of the information or indictment; and (4) except as provided in paragraph (B), written jury instructions." We were thus permitted, pursuant to Rule 646(A), to allow the jury to see the prior consistent statement during deliberation, once it was determined that the statement was properly admitted. Rule 646(C), which is otherwise the only provision limiting 646(A), was not implicated.

### D. Our Refusal to Give a "Delayed Reporting" Jury Instruction.

Defendant also alleges that we erred "in not giving the 'delayed reporting' jury instruction." Def.'s Statement ¶ 5(d). At trial, defense counsel argued that "the facts of this

48

case would support charging the jury under [Suggested Standard Criminal Jury Instruction 4.13A]," to which the Commonwealth responded, "I do not believe that the jury instruction for prompt complaint applies in this case and I think the record reflects that the victim in this matter did quickly complain within 12 hours of it; and, therefore, I don't think the prompt complaint instruction is appropriate. I think that instruction is intended to be utilized when either weeks, months or years have passed." Trial Tr. 2.331, Aug. 27, 2015. We denied Defendant's request for this point of charge. *Id.*

A charge "is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to a fundamental error. Consequently, the trial judge has wide discretion in fashioning jury instructions." *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. Ct. 2006) (internal citations omitted). Moreover, we are not "required to give every charge that is requested by the parties[,] and [our] refusal to give a requested charge does not require reversal unless the [Defendant] was prejudiced by that refusal." *Id.* (internal citation omitted).

As the Superior Court has noted, "[t]he prompt complaint instruction is based upon a belief that a victim of a violent assault would reveal the assault occurred at the first available opportunity." *Id.* The purpose of the instruction was to "allow a jury to call into question a complainant's credibility when he or she did not complain at the first available opportunity." *Id.*

However, the propriety of this instruction "is determined on a case-by-case basis pursuant to a subjective standard based upon the age and condition of the victim." *Id.* As the court explained, "where the victim of a sexual assault is a minor who may not have appreciated the offensive nature of the conduct, the lack of a prompt complaint would not

49

necessarily justify an inference of fabrication." *Id.* Furthermore, "prompt reporting does not require a revelation to the first person one sees after his or her attack." *Id.* at 971.

ZS gave a credible explanation for the twelve hour period between Defendant's solicitation and ZS' report: ZS went home after the event and went straight to his room, and did not tell his mother because, "It was something I didn't feel comfortable telling her." Trial Tr. 1.119, Aug. 26, 2015. While ZS could not recall if he ate supper with his mother, he testified that his sister returned home from work around 12:30 a.m., and he spoke with her before going to bed around 1:30 a.m., *id.* at 1.161, after which he laid there, "just thinking [about] what Carl said to me. I felt uncomfortable knowing that I had to live beside him, and so I went back to my mom's room crying and told her what had happened, that we had to talk, and told her what he said to me." *Id.* at 1.120.

Taking into account ZS' was age fourteen at the time; the fact that this solicitation was made by ZS' long-term next-door neighbor, whom ZS had done yard work for over the course of years, and who had been generous to ZS' family and children in the neighborhood generally; that the subject-matter of the incident made ZS feel uncomfortable about disclosing this to his mother and sister; and that ZS ultimately reported the incident to his mother and sister within approximately twelve hours, before even being able to fall asleep for the night, we found that the time between the incident and ZS' report to his mother was not sufficient enough to warrant a jury instruction as to delayed reporting.

### 3. Denial of Defendant's Motion for New Trial.

Defendant alleges that the "trial court erred in denying defendant's 11/10/15 Motion for New Trial." Def.'s Statement ¶ 6. Defendant did not file a Motion on November 10, 2015. However, we denied Defendant's Motion for New Trial on November 9, 2015, and that

50

Order denying Defendant's Motion was filed on November 10, 2015. The Motion itself was filed on October 27, 2015.

In his Motion, Defendant argued, "All verdicts were against the weight of the evidence in that all Commonwealth testimony [by ZS]...was improperly bolstered by inadmissible hearsay...[i.e., by the Court] allowing the Commonwealth to enter the Complainant's sworn statement dated July 3, 2012 into evidence over a defense objection that it is hearsay...." Def.'s Mot. ¶ 1, Oct. 27, 2015. Defendant relied primarily on *Commonwealth v. Jubilee*, 589 A.2d 1112 (Pa. Super. Ct. 1991).

We addressed this argument in *supra* section III(2)(C).

Defendant also made a "weight of the evidence" argument, which we address in *infra* section III(6).

### 4. Sentencing Errors.

Defendant makes the following allegations of error pertaining to his sentencing:

> [T]he trial court improperly considered the Sexual Offender Assessment Board report during the sentencing despite the Commonwealth's decision not to seek a Sexually Violent Predator designation; [and]...the discretionary aspect of the sentence was in error because
>
> a. The defendant had no prior criminal history; and
>
> b. The defendant's Sexual Offender Assessment Board [SOAB] report was considered despite the Commonwealth not seeking a Sexually Violent Predator [SVP] designation.

Def.'s Statement ¶¶ 7-8.

We indeed considered the information in the Sexual Offenders Assessment Board's report, though the Commonwealth had not sought a Sexually Violent Predator designation. Sentencing Hr'g 11, 27, Nov. 19, 2015. The Commonwealth asked for the SOAB report to be

51

made part of Defendant's pre-sentence investigation report and thereby a part of the record. *Id.* at 11. Defense counsel objected:

> Your Honor, I object to the introduction of the report. The purpose of the SOAB investigation, as I understand it, was to gather information...and make a recommendation to the Court as to whether or not Mr. Fisher should be determined to be a sexually violent predator. [...]
>
> [T]he problem with allowing this into evidence....is that there are a lot of findings in here, which are, frankly, not supported by anything other than the opinion of this individual, who is not here today; and we have pages of hearsay...of allegations made by people who weren't even related to this case and did not testify at trial...who are not here and who I won't have an opportunity to question. So for those reasons, I think this should be stricken.

*Id.* at 12-13. We asked the Commonwealth to respond; and the Assistant District Attorney rejoined, "I believe the information contained therein is relevant as it relates to the Court's sentencing of Mr. Fisher today; and that is, the Court...in its...broad discretion in its sentencing powers [can] tak[e] what information it would like into consideration for his sentence today." *Id.* at 13. We admitted the report pursuant to Pa.R.Crim.P. 702. *Id.*

Our perusal of relevant case law has uncovered no binding appellate precedent indicating that we cannot consider the SOAB report when the Commonwealth has not sought an SVP designation. We believed that Defendant "is not entitled to the same due process protections at the time of sentencing that he is at trial," and that "hearsay testimony is precisely the type of evidence...[which] is the right of a court in sentencing to consider...even though such information is obtained outside the courtroom from persons whom the defendant has not been permitted to confront or cross-examine." *Commonwealth v. Medley*, 725 A.2d 1225, 1230 (Pa. Super. Ct. 1999) (internal quotations and citation omitted).

As the Superior Court noted, "the admission of hearsay in sentencing proceedings,

52

especially those which do not involve a capital crime, is a common occurrence." *Id.* Moreover, "sentencing courts, as a matter of course, consider hearsay in nearly every sentencing case since pre-sentence investigations are routinely ordered and considered by the court, and a pre-sentence report is the very definition of hearsay, i.e., the pre-sentence report is a report by a probation officer reciting other persons' out-of-court statements offered for their truth." *Id.*

We submit that Pa.R.Crim.P. 702(A)(3), insofar as it directs that the pre-sentence investigation report "shall include information regarding the circumstances of the offense and the character of the defendant sufficient to assist the judge in determining the sentence," permitted attachment of the SOAB report, which aided us in ascertaining the "character of the defendant." *See also, Commonwealth v. P.L.S.*, 894 A.2d 120, 135 (Pa. Super. Ct. 2006) (Bender, J., concurring) ("I do not intend that admissions or other information obtained through the SOAB investigation be excluded from *consideration* in imposing sentence. Indeed, Megan's Law provides that '[i]n all cases where the [SOAB] has performed an assessment pursuant to this section, copies of the report shall be provided to the agency preparing the presentence investigation.' 42 Pa.C.S.A. § 9795.4 Thus, Megan's Law contemplates that information from the SOAB investigation may properly find its way into the PSI report and, accordingly, into the hands of the sentencing judge.") (emphasis in original); *Commonwealth v. Shugars*, 895 A.2d 1270, 177 n. 9 (Pa. Super. Ct. 2006).

In any event, for Solicitation to Commit IDSI, we sentenced Defendant to incarceration in a State Correctional Institution for not less than four years nor more than eight years, with the other inchoate offenses merging for sentencing purposes; and for Corruption of Minors we sentenced Defendant to incarceration in a State Correctional

Institution for not less than six months nor more than seven years, to be served concurrently with the Solicitation sentence. We note that our sentence for Solicitation is well within the standard range of the sentencing guidelines (i.e., thirty-six to fifty-four months). *See,* Guideline Sentencing Form 1, Jan. 6, 2016.

Sentencing "is a matter vested within the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Shugars,* 895 A.2d at 1275. An abuse of discretion is more than a mere error in judgment; it must be shown that "the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." *Id.* Moreover, where a Defendant has not alleged that the trial court applied the guidelines erroneously or that the court sentenced him outside the guidelines, the defendant must demonstrate that the case involves circumstances where the application of the guidelines would be "clearly unreasonable." 42 Pa. Cons. Stat. § 9781(c).

Here, we sentenced within the guidelines, and we stated our reasons on the record as being, apart from the findings in the SOAB report, that "the defendant's actions resulted in emotional trauma to the victim and the victim's family[,]" "the seriousness of the offense, the defendant's lack of remorse [which] indicate that defendant's rehabilitation will require an extended period of incarceration[,]" and the fact that "any lesser sentence would depreciate the seriousness of the offenses." Hr'g Tr. 29, Nov. 19, 2015. We believe that Defendant's damaging criminal act, along with his unrepentant conduct throughout the duration of these proceedings, more than support application of the standard range guidelines, and, therefore, there was nothing unreasonable about sentencing Defendant in accordance with them.

Furthermore, "The sentencing court is *not* required to state its reasons for sentencing

54

within one guideline range over another." *Commonwealth v. Wright*, 600 A.2d 1289, 1291 (Pa. Super. Ct. 1991) (emphasis in original). Moreover, where a "court consider[s] the statutory factors, including the mitigating circumstances, [and] sentence[s] within the guidelines, and state[s] its reasons on the record for the sentence imposed," the court "properly discharge[s] its function, and [is] neither required to sentence within the mitigated range nor specify its reason for choosing not to do so." *Id.* at 1293.

### 5. Prosecutorial Misconduct.

Defendant alleges that

> The District Attorney's Office engaged in prosecutorial misconduct for amending the information after the preliminary hearing, arresting the defendant without probable cause, coordinating testimony, failing to act on defendant's private criminal complaints, and failing to request the Attorney General prosecute this case due to the conflict of interest arising from the private criminal complaints.

Def.'s Statement ¶ 9. Each of these contentions has been addressed multiple times in this opinion and throughout the course of this litigation. *See, supra* §§ (III)(1)(A), (C), (E), (F).

### 6. Verdict Against the Weight and Sufficiency of the Evidence.

Defendant was convicted of Corruption of Minors; Solicitation to Commit IDSI; Solicitation to Commit Indecent Assault; Attempted IDSI; and Attempted Indecent Assault. Defendant claims, lastly, that the verdict was against the weight of the evidence. Def.'s Statement ¶ 10. Defendant does not specify in his Statement how the verdict was against the weight of the evidence. However, given that Defendant took the stand and offered a version of events that was contrary to what ZS had testified to, we must assume that Defendant is asserting here that the jury should have believed his testimony rather than that of ZS. We disagree.

55

When there is a claim that a verdict is against the weight of the evidence, our role "is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal quotations and citation omitted). In other words, we must determine "whether the preponderance of the evidence opposes the verdict...." *Id.* at 1056 (internal quotations and citation omitted). Put otherwise, "A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Vandivner*, 962 A.2d 1170, 1177 (Pa. 2009).

We suggest the verdict here was consistent with the weight of the evidence. In criminal proceedings, "the credibility of witnesses and weight of evidence are determinations that lie solely with the trier of fact, [which] is free to believe all, part, or none of the evidence." *Commonwealth v. Lewis*, 911 A.2d 558, 566 (Pa. Super. Ct. 2006). The only evidence opposing Defendant's guilty verdict is his own self-serving testimony, which the jury was entitled to, and clearly did, disbelieve. Defendant alleged in his Motion for New Trial that his testimony outweighed ZS' because ZS had been impeached; however, ZS' testimony had been rehabilitated (which Defendant has also complained of and which we addressed *supra*), and the inculpatory statements Defendant made in his e-mail were also properly before the jury, which supported ZS' testimony and undermined Defendant's account.

Defendant also attacks the sufficiency of the evidence supporting the verdict. Def.'s Statement ¶ 10. Here, we again point out that Defendant has not specified the manner in which the evidence is insufficient. We believe this lack of specificity renders the issue

56

waived on appeal. In order to preserve the issue, it was necessary for Defendant's Rule 1925 Statement to have specified the elements of the offenses that he claims the evidence was insufficient to support. *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009). Failure to provide this specificity results in waiver of the claim. *Id.* To the extent that the issue is not deemed waived on appeal, viewing the evidence in a light most favorable to the Commonwealth, we are satisfied that the evidence was sufficient to meet each of the elements of the offenses of which Defendant was convicted.

## 7. Ineffective Assistance of Counsel.

Defendant also asserts that his trial counsel was ineffective in various respects, i.e., failing to request a continuance in order to schedule a hearing on Defendant's June 23, 2015 Objection to Transcript; failing to "elicit during cross-examination of the Commonwealth's witnesses that the testimony was falsified," and for "failing to object to the prosecution's closing remarks that deemed defendant as thinking he was 'the smartest person in the room' and having an 'unhealthy interest' in children." Def.'s Statement ¶¶ 11(a)-(c).

We submit that Defendant's ineffective assistance of counsel claims are not properly raised at this stage of the litigation, but rather must wait until collateral review. As our Supreme Court has repeatedly emphasized, *Commonwealth v. Grant*'s "general rule of deferral to PCRA review remains the pertinent law on the appropriate timing for review of claims of ineffective assistance of counsel...." *Commonwealth v. Holmes*, 79 A.3d 562, 563 (Pa. 2013) (citing *Grant*, 813 A.2d 726 (Pa. 2002)). Stated otherwise, the Court held, "we reaffirm *Grant* and hold that, absent the circumstances we address below, claims of ineffective assistance of counsel are to be deferred to PCRA review; trial courts should not entertain claims of ineffectiveness upon post-verdict motions; and such claims should not be

57

reviewed upon direct appeal." *Id.* at 576.

The Superior Court summed up the two exceptions to the *Grant* rule as follows:

> First, there may be an extraordinary case where the trial court, in the exercise of its discretion, determines that a claim (or claims) of ineffectiveness is both meritorious and **apparent from the record** so that immediate consideration or relief is warranted...Second, our Supreme Court determined that in cases where "prolix" claims of ineffectiveness are raised, unitary review, if permitted at all, should only proceed where accompanied by a knowing, voluntary and express waiver of PCRA review.

*Commonwealth v. Harris*, 114 A.3d 1, 5-6 (Pa. Super. Ct. 2015) (citing *Holmes*, 79 A.3d at 577-78) (emphasis in *Harris*) (internal quotations and citations omitted). We do not believe that this case satisfies either exception. Therefore, we suggest that Defendant's ineffective assistance of counsel claim should not be entertained on direct review.

RESPECTFULLY SUBMITTED:

D. Gregory Geary, P.J.

Dated: May 25, 2016

58